In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-2706

N.L.A., H.O.P.M., and S.L.P.L.,

*Petitioners*,

*v.*

ERIC H. HOLDER, JR.,
Attorney General of the United States,

*Respondent.*

Petition for Review of Orders
Of the Board of Immigration Appeals.

ARGUED JANUARY 20, 2012 — DECIDED MARCH 3, 2014

Before FLAUM and ROVNER, *Circuit Judges* and CASTILLO,
*District Judge.**

ROVNER, *Circuit Judge.* After Colombian guerillas from the
Revolutionary Armed Forces of Colombia (FARC) kidnapped

---

* The Honorable Rubén Castillo, Chief Judge of the United States District
Court for the Northern District of Illinois, sitting by designation.

her father and killed her uncle, N.L.A.[1] fled Colombia for the United States. After entering the United States legally on a tourist visa, N.L.A. and her family overstayed their visa and then applied for asylum within the one year requirement of the Immigration and Nationality Act (Act), claiming that they were victims of persecution by the FARC and were in danger of future persecution should they return to their native Colombia. N.L.A.'s husband and daughter filed derivative claims claiming that if N.L.A. should be granted asylum, by statute, they would be as well.[2] The immigration judge concluded that N.L.A. failed to meet her burden of proof that she has suffered from past persecution or that she would suffer from future persecution on the basis of her membership in a social group of land owners (or some permutation of that category) or because of her political opinion. The Board of Immigration Appeals (Board) affirmed. These decisions, however, do not reasonably follow from the record evidence and compel a contrary conclusion. For this reason we grant the petition for review and remand to the Board for further consideration of N.L.A.'s case and her family's derivative claims.

---

[1] N.L.A. has been granted permission to proceed using a pseudonym based on N.L.A.'s claim that if she and her family are removed to Colombia, identifying information would place them and her sister's family (who currently lives in hiding in Colombia) in danger of retaliation by the FARC. Appellate Record at 2 and 5.

[2] N.L.A. has two daughters, but only one is party to this appeal, as the other was married and could not make a derivative claim at the time of filing. The other daughter's derivative claim remains as she was unmarried and under twenty-one at the time of filing. 8 U.S.C. § 1158(b)(3)(B).

**I.**

There can be no doubt that the threat of violence to civilians by guerilla groups in Colombia continues to some degree. The question of who is persecuted by these threats and whether the government is unable or unwilling to contain them is unresolved and presented in this case.

In *Escobar v. Holder*, we described in some detail the ongoing conflict in Colombia attributable to the leftist revolutionary FARC and its leaders' attempts to overthrow the Colombian government. *Escobar v. Holder,* 657 F.3d 537, 540 (7th Cir. 2011). FARC's tactics are brutal. The FARC regularly kidnaps and kills local party officials and members. *Id.* In accordance with their leftist politics, the FARC often targets landowners on the theory that land should not be privately owned and should belong to the people. *See Tapiero de Orejuela v. Gonzales*, 423 F.3d 666, 669, 672 (7th Cir. 2005); *International Protection Considerations Regarding Colombian Asylum Seekers*, 15 INT'L J. REFUGEE L. 318, 319 (2003). (R. 615). Consequently, members of FARC seek out landowners and subject them to a "*vacuna*"—an extortion or a tax to remove wealth from land owners and transfer it to the war chest for FARC's cause. ("*vacuna*" literally translates as "a vaccine,"—presumably against FARC violence)

According to N.L.A.'s testimony, which the immigration judge found to be credible (R. 72), N.L.A.'s father and her uncle both owned farms in Colombia, about one hour away from each other. In 2003, the FARC began targeting N.L.A.'s uncle, stealing livestock, and demanding that the uncle pay the *vacuna*. The uncle was opposed to financing the activities of the

FARC and thus refused to make the payments. Consequently, on the night of September 13, 2003, the FARC abducted and then killed him.[3] The police performed an initial investigation and determined that the FARC was responsible for the murder, but the crimes were never solved. N.L.A. testified that because both witnesses and the police fear retribution by the FARC, the crimes they commit are rarely solved. In fact, the police themselves are often victims of FARC kidnappings and murder. *See* U.S. Department of State, *Report on Human Rights Practices: Colombia,* 2, 7 (2003) (R. 908, 913); United Nations Comm'n on Human Rights, *Report of the High Commission for Human Rights on the Situation of Human Rights in Colombia*, 11, 23 (2005) (R. 495, 507); Luz E. Nagle, *Colombian Asylum Seekers and What Practitioners Should Know About the Columbian Crisis*, 18 Geo. Immigr. L. J., 216 (2004) (R. 600); United Nations Comm'n on Human Rights, *Report of the High Commission for Human Rights on the Situation of Human Rights in Colombia.* (2002) (R. 807, 819, 820, 827).

---

[3]  A Colombian newspaper reporting on the murder wrote: "The local communist leader, ex town councilor and ex candidate of the Department Assembly, Alfonso Lopez, was assassinated by heavily armed men in uniforms on September 19, in the early morning hours, in his country house on the San Francisco path, in the town of Tibacuy, in the Department of Cundinamarea. The day before, in Silvaina, Tibaeuy and Viotá the Army had carried out an unlawful entry and captured seventy people, accused of collaborating with FARC, in one of the 'miraculous catches,' which the Public Force has carried out throughout the country. In spite of this being a militarized zone, these assassinations were performed with the most complete impunity." (R. 289)

Two months after members of FARC murdered the petitioner's uncle, the FARC kidnapped the petitioner's father. Unbeknownst to N.L.A., the FARC had been unsuccessfully demanding money from her seventy-two-year-old father for months. On November 18, 2003, while he was performing his daily inspection of the farm, he was taken captive. A masked man went to his house and told his wife that her husband was fulfilling his duty by giving information to the FARC, and that both she and her husband would be killed if the family contacted the police. The FARC held N.L.A.'s father for eleven days, during which time he was interrogated about who had title to the farm, where his children lived, what they owned, and where his grandchildren went to school. Under duress, the father told the FARC where N.L.A. and her sister lived and that they had title to the farm. The FARC threatened the father that his daughters would be expected to pay the monthly *vacuna* or hand over title to the farm, or they would be killed.

After eleven days, N.L.A.'s father was dropped off along a highway and forced to walk home. The family testified that he arrived at the farm weak, starved, dehydrated, and complaining of kidney pain. As a result of the kidnapping and the fear of future harm, N.L.A.'s parents and sister moved seven hours away to another town and changed their names.[4] The sister and her husband opened a pharmacy in the town, but put the pharmacy in the name of a third party. The family changes apartments and phone numbers frequently to evade the FARC.

---

[4] The record is contradictory as to whether the sister moved four or seven hours away.

N.L.A. and her family also abandoned their home, disconnected their phone, and began living in hiding with the family of N.L.A.'s husband, H.O.P.M. They moved between the houses of various relatives and used a cell phone with an unlisted number as their only means of telephone communication. In December 2003, shortly after the kidnapping, N.L.A. visited the United States embassy to request asylum, but she found that she would need an attorney to make the request. The attorney advised N.L.A. that, because she and her family already possessed valid U.S. visas, it would be easier for her to enter the United States legally and request asylum from within. Because N.L.A. believed that her family was in imminent danger, the family immediately bought tickets, leaving their home vacant, their business in the hands of a partner, and most of their possessions behind. N.L.A. and her family entered the United Sates with valid tourist visas on January 13, 2004, and filed an application for asylum and withholding of removal on January 11, 2005, within the one year application deadline.

Since they have left the farm, neighbors have reported seeing "suspicious-looking people" poking around, but the FARC has not managed to dole out threats or harm to N.L.A.'s family—either the ones living here or the ones living in hiding in a new town in Colombia.

The immigration judge denied the application for asylum and withholding of removal and the Board affirmed with its own written opinion, thus requiring us to review both opinions—using the de novo standard for the legal conclusions and deferentially for the factual conclusions, reversing only if the evidence compels a different result. *Cece v. Holder*, 733 F.3d 662, 675-676 (7th Cir. 2013) (en banc). That is "we review the

Board's findings under the substantial evidence standard, which requires us to assess whether the Board's determination is supported by reasonable, substantial, and probative evidence on the record considered as a whole and to reverse only if the evidence compels a contrary conclusion." *Abdoulaye v. Holder*, 721 F.3d 485, 490 (7th Cir. 2013) (internal citations omitted).

The immigration judge concluded that the FARC had only threatened N.L.A.'s father and not N.L.A. and that therefore her claim of past persecution was derivative to her father's, and thus not allowed under our case law. And because the FARC had not threatened nor even contacted N.L.A.'s sister since she moved to a new town, N.L.A. could not demonstrate an objectively reasonable fear of future persecution. (R. 103-07). The immigration judge equivocated as to whether the social groups of "child[ren] of a[n] upper-middle class land owner from Colombia" or "child[ren] or daughters[s] of a land owner who has been kidnapped by the FARC" could qualify as legitimate social groups under the Act. But because the judge did not find any evidence of persecution, an ultimate decision on the issue was not necessary. (R. 104). The Board agreed with the immigration judge on all substantive points, but concluded definitively that neither of the administrative judge's proposed social group categories were cognizable under the Act. (R. 5-6).

## II.

To be eligible for asylum, an immigrant must demonstrate that she "is unable or unwilling to return to" her country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, member-

ship in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). The persecution must be either that which she has suffered in the past or a demonstration that she has a well-founded—that is subjectively genuine and objectively reasonable—fear of future persecution, or both. *Bathula v. Holder*, 723 F.3d 889, 898 (7th Cir. 2013). If the applicant can establish that she has suffered past persecution on the basis of a protected ground, the existence of a well-founded fear is presumed. 8 C.F.R. § 1208.13(b)(1); *Bathula*, 723 F.3d at 898. The Government can rebut the presumption by showing either a fundamental change in conditions in the applicant's home country or that, under all the circumstances, it would be reasonable to expect the applicant to relocate to another part of the applicant's country. 8 C.F.R. § 1208.13(b)(2)(ii); *Bathula*, 723 F.3d at 898. In cases in which the applicant has not established past persecution and can only proceed by demonstrating fear of future persecution, the asylum applicant bears the burden of establishing that she cannot reasonably relocate to another part of her home country to avoid persecution. *Cece,* 733 F.3d at 687.

In the estimation of the immigration judge and Board, N.L.A.'s claim of past persecution is based largely on the harm suffered by her uncle and father and thus is "derivative" and not permitted in this Circuit. *See Firmansjah v. Gonzales,* 424 F.3d 598, 605 (7th Cir. 2005); *Ciorba v. Ashcroft*, 323 F.3d 539, 545 (7th Cir. 2003). The Board concedes that the FARC warned N.L.A.'s father that N.L.A. and her sister would be harmed if the family did not pay a *vacuna* or relinquish title to the farm, but concluded that because N.L.A. herself was not harmed and had no direct contact with any of its members, the claim was only derivative to her father. The unfulfilled threat, not made

directly to N.L.A., was insufficient, the Board reasoned, to constitute persecution.

This court has declared, however, that credible threats of imminent death or grave physical harm can indeed be sufficient to amount to past persecution, provided they are credible, imminent and severe. *Stanojkova v. Holder*, 645 F.3d 943, 948 (7th Cir. 2011); *Bathula*, 723 F.3d at 900; *Boykov v. INS*, 109 F.3d 413, 416 (7th Cir. 1997) (acknowledging that threats "of a most immediate and menacing nature might, in some circumstances, constitute past persecution."). The Board concluded that the threats in this case failed to reach this level because they were unfulfilled and were directed primarily toward N.L.A.'s uncle and father, and not toward N.L.A. But the murder of N.L.A.'s uncle and the kidnapping of her father were, in fact, part of the threat to N.L.A. The FARC funds its war chest by threatening to kill or harm landowners (or cattle breeders or farmers or wealthy business persons) who do not pay a *vacuna* or relinquish title to their land or property. The threats have force because the FARC backs them up with acts of violence when its demands are not met. By killing the uncle and kidnapping the father, the FARC was announcing to N.L.A. and her sister, "we are targeting your family and this is what happens when you fail to pay the *vacuna*."

The threat of death or grave bodily harm was credible. The FARC had threatened the family before and proved that they would follow through on their threats by killing the uncle and kidnapping the father—the gravest harms possible. And the threat was imminent. The FARC had begun harassing N.L.A.'s uncle only a few months before they killed him. And then, less

than one month later, they kidnapped his brother. The FARC had stepped up its pace and N.L.A. and her sister reasonably feared that they would be next. N.L.A.'s sister immediately moved and began living in hiding, and N.L.A. initiated her path to asylum the following month by visiting the United States embassy in Colombia.

The Board erred by misconstruing the nature of the threat. The Board, agreeing with the immigration judge, labeled N.L.A.'s claim as a "derivative claim." (R. 4). The term "derivative," however, has a different meaning in the asylum context. Although the misnomer itself is not problematic, it seems to have led to some confusion about the nature of the persecution in this case. Ordinarily in asylum law we use the term "derivative claims" to refer to a specific statutory provision that allows spouses and children of asylum applicants to be granted the same status as the applicant even if the spouse or child would not otherwise be eligible for asylum on his or her own. *See* 8 U.S.C. § 1158 (b)(3)(A). In a second use of the term "derivative claim," we describe a situation in which harm to an applicant's spouse or child constitutes persecution of the primary asylum seeker. *Gatimi v. Holder*, 578 F.3d 611, 617 (7th Cir. 2009) ("Genital mutilation of one's wife, unless one happens to be a supporter of the practice, is a way to punish one, and so the menace to [the spouse] is a legitimate component of [the asylum seeker's] case."). In this sense, it might be less confusing to describe this type of persecution as "persecution by proxy." *See Zhou Ji Ni v. Holder*, 635 F.3d 1014, 1018 (7th Cir. 2011). As we explained in *Gatimi*, "[i]f your house is burned down, or your child killed, in order to harm you, the fact that you are not touched does not mean that those acts

cannot constitute persecution of you." *Gatimi*, 578 F.3d at 617. In many instances, watching a loved one suffer is more harmful than suffering oneself.

The harm that the immigration judge and Board described as "derivative" in this case is not really derivative at all. The harm to N.L.A.'s father was meant as a direct threat to N.L.A. herself. The direct message from the FARC was, "if you do not pay the *vacuna*, this will happen to you as well."

In *Ciorba v. Ashcroft*, 323 F.3d 539, 545 (7th Cir. 2003), we explained that an asylum applicant cannot rely solely on the persecution of her family members to qualify for asylum, but rather must show that her family's political opinions have been imputed to her and that she has suffered or will suffer persecution as a result. The claims that we reject as "derivative," are those in which family members suffer legitimate persecution, but the applicant's suffering, although perhaps caused by the family member's persecution, does not itself, rise to the level of persecution. For example, in *Tamas-Mercea v. Reno*, 222 F.3d 417, 424 (7th Cir. 2000), the applicant did not argue that he was subjected to the persecutive acts lobbed against his family, but "instead, claims a type of derivative persecution, that which arose from the physical abuse of his family members and the discrimination he personally endured because of his family's" political opinion. *Id*. The applicant himself merely suffered in the form of lesser grades and lesser jobs. The court found that "if Mr. Tamas personally had suffered the type of harm inflicted on his family members, we would have little trouble concluding that he had suffered persecution within the meaning of the statute." *Id. See also Bereza*, 115 F.3d at 476

(rejecting the derivative nature of the claim where the applicant's mother was subject to persecution, but the petitioner had been subjected only to adverse educational and employment actions which did not, on their own, rise to the level of persecution).

The Board cites *Firmansjah v. Gonzales* for the proposition that "we [reject] claims of derivative persecution," but the persecution alleged in that case had only been inflicted on the petitioner's parents and not used as a means to persecute the petitioner. *Firmansjah v. Gonzales*, 424 F.3d 598, 605 (7th Cir. 2005). Firmansjah was ethnically Chinese but living in Indonesia with her parents where anti-Chinese violence was prevalent and overlooked by the government. *Id.* at 600. Fitmansjah left Indonesia to study in the United States and while she was there her parents were forced to change their Chinese surnames to Indonesian ones to prevent persecution. *Id.* at 600, 605. Neither she nor any member of her family was ever threatened or otherwise harmed in Indonesia. *Id.* at 605. This court concluded that the parent's name change did not establish that Firmansjah had been persecuted, and that, in any event, although having to change one's name is reprehensible, it did not rise to the level of persecution. *Id.* at 605. The Board also cites *Ingmantoro v. Mukasey*, 550 F.3d 646, 650 (7th Cir. 2008) as an example of the distinction between derivative claims, where the respondent seeks relief on the basis of shared harm with a family member, and claims where the respondent is the intended target of harm leveled at a family member. In *Ingmantoro*, however, this Court questioned whether Ms. Ingmantoro's claim was really a derivative claim at all. *Id.* at 649-50. When anti-Chinese thugs burned down her father's store, they did so

in the course of pursuing Ms. Ingmantoro herself. The court noted that she did not simply share in the persecution leveled against her family, she was, herself, the target of the persecution. *Id.* at 650. Instead of deciding that Ms. Ingmantoro had a derivative claim, this court determined that it could not say, with the record on hand, that the harm suffered by Ms. Ingmantoro rose to the level of persecution. *Id.* at 649-50. The panel also concluded that Ms. Ingmantoro presented a very thin case that the acts occurred on the basis of her Christian charity work. *Id.* More importantly, Ms. Ingmantoro did not present any evidence linking the nefarious acts to government action. *Id.* at 650. In sum, the *Ingmantoro* case supports N.L.A.'s case by demonstrating how acts leveled against a family member of an individual can indeed constitute persecution of that individual. Thugs burned Ms. Ignamontoro's father's shop as a way of threatening her, just as the FARC kidnapped N.L.A.'s father as a way of sending a direct threat to N.L.A. who held title, along with her sister to the land in question.

In contrast, one can imagine a situation in which one family member is targeted because of specific activities or characteristics that others in the family do not share. For example, the government sponsored or encouraged execution of a high ranking political leader in an unpopular political party does not, without other evidence, indicate that the other members of the family are at risk of death or serious injury. If the other family members are not also leaders of the party, they are not similarly situated and not necessarily targets. *See, e.g.*, *Mabasa v. Gonzales*, 455 F.3d 740, 746 (7th Cir. 2006).

In this case, the persecution of N.L.A.'s father was certainly evidence that the FARC was gunning for N.L.A. and her family. *See Gatimi*, 578 F.3d at 611. In fact, the entire purpose of kidnapping and releasing the father was to send a message to the family about what happens to land owners who will not pay the *vacuna*. If there was any doubt, the FARC made it clear by specifically telling N.L.A.'s father to carry the message home that the daughters would be killed if they failed to pay the tax.

N.L.A. testified that during her father's time in captivity, the FARC threatened him that "if he didn't hand over the farm or pay the monthly *vacuna*, it would cost the lives of his daughters and grandchildren." (R. 383) (aff. of N.L.A. at 6). The threat to N.L.A. was serious and severe. It is true that the FARC did not make the threat to N.L.A. personally, that is by speaking to her face-to-face, by phone, or mail. The threat was issued to her directly by messenger—her kidnapped and vulnerable father. We can think of no more direct a threat than one made to a parent about harming a child. Such a threat becomes a threat to both the parent and the child.

It is no surprise that N.L.A. did not receive any threats personally. Immediately after her father was released from the captivity during which he revealed his daughters' interest in the farm, N.L.A. and her sister both disappeared. N.L.A. and her family went into hiding with her husband's family, abandoning their home and telephone number. N.L.A.'s sister moved to a different town, changed her name, opened a business under a third party's name, and changes homes every six months. N.L.A. and her family fled to the United States

approximately one and a half months after the FARC released her father—with barely enough time for the FARC to find her.

The Board accepted as credible N.L.A.'s testimony about the threat made to her through her father, but fumbled the analysis by misidentifying N.L.A.'s claim as derivative and concluding that N.L.A. herself was not harmed and never had any contact with members of the FARC. As we have established, N.L.A. received a credible threat of imminent harm—one that was backed by the most proof of seriousness that one could require—the actual killing of one family member and kidnapping of another. No reasonable fact finder could conclude otherwise.

The Board also based its "derivative claim" analysis on the fact that there was no evidence that N.L.A. ever held title to her father's farm and that if she did obtain title, it was not until her father died in 2009. Both of these points may, in fact, be true. The relevant fact, however, is that, while he was kidnapped, N.L.A.'s father, under extreme pressure, told the FARC that he had to talk to his daughters before making any arrangement because they had the title to the farm. (R. 168) (tr. 10/31/09 at 53); (R. at 383) (aff. of N.L.A. at 6). It certainly would make no difference to the FARC that N.L.A.'s father may have been legally incorrect.

An applicant who successfully proves that she was subject to past persecution is presumed to have a well-founded fear of future persecution, which the Attorney General can rebut by demonstrating a change in conditions in the applicant's home country. 8 C.F.R. § 1208.13(b)(1); *Cece*, 733 F.3d at 668. The Board did not have to rebut any findings, as it determined that

N.L.A. had not faced past persecution. An applicant who has not been found to have faced past persecution, however, can qualify for asylum by demonstrating an objectively reasonable, well-founded fear of future persecution. 8 C.F.R. § 208.16(b)(2); *Kllokoqi v. Gonzales*, 439 F.3d 336, 345 (7th Cir. 2005).

Because we find past persecution, we can presume that N.L.A. would face future persecution, but we would find a legitimate fear of future persecution regardless. The Board's determination that N.L.A. had not demonstrated an objectively reasonable fear of future persecution was not supported by reasonable and probative evidence on the record. *See Abdoulaye*, 721 F.3d at 490. The Board's conclusion was that in the seven years since the murder of the uncle and the kidnapping of the father, the FARC had never contacted N.L.A. or her sister directly. It further concluded that the reports from the neighbors that the FARC is still monitoring the farm and searching for the family come from multiple levels of hearsay and have not been substantiated with declarations from the neighbors or the sister.

As we have already noted, it is unsurprising that the FARC never contacted N.L.A. or her sister. N.L.A. has left Colombia for the United States and the FARC has likely lost interest.[5] The

---

[5] Of course it is theoretically possible for the FARC to contact N.L.A. in the United States. The fact that it has not may simply be a reflection of several factors, including the fact that the government in the United States may be more aggressive about and more successful in pursuing terrorist activity, and that the FARC, like any organization, knows that its pursuit of N.L.A. and her family would be costly and lead to little chance of financial or other gain.

sister moved to another town seven hours away, changed her name, moves her home every few months, changes her mobile telephone number frequently, and runs a pharmacy under a third party's name. It simply defies logic to conclude that potential guerilla targets who continually move apartments, change their phone number and operate a business under an assumed name are not living in hiding because they work "openly" (using an assumed name) in the business and the children leave the home to attend school.

In other cases we have assumed that such behavior constitutes hiding. *See e.g. Castilho de Oliveira v. Holder*, 564 F.3d 892, 895 (7th Cir. 2009) (describing the family's behavior of moving homes and children's school frequently as "hiding"); *Iao v. Gonzales,* 400 F.3d 530, 533 (7th Cir. 2005) (noting that we may infer "hiding" even when the word is not used, when an applicant states that village officials repeatedly visited her home and she managed to evade them each time.); *Agbor v. Gonzales*, 487 F.3d 499, 505 (7th Cir. 2007) (living in hiding does not constitute safe relocation); *Giday v. Gonzales*, 434 F.3d 543, 555 (7th Cir. 2006), *superceded by statute on other grounds*, ("[I]t is an error of law to assume that an applicant cannot be entitled to asylum if she has demonstrated the ability to escape the persecution only by chance or by trying to remain undetected."); *Min Ning Lin v. Mukasey*, 313 Fed. Appx. 854, 855 (7th Cir. 2008) (unreported but helpful in describing hiding as moving from place to place for a year). The Board's reliance on the fact that the petitioners had not been contacted by the FARC is not a reasonable one when her sister lives in hiding in Colombia and N.L.A. has fled to the United States—outside the reach of the FARC.

The neighbors have informed N.L.A.'s sister that the FARC still visits the family farm searching for the family. The Board concluded that since this claim was hearsay and unsupported by declarations from the neighbors, the sister's friends or the sister herself, the claims were entitled to reduced weight. Reduced from what or as compared to what, we might ask? In any event, the Federal Rules of Evidence do not apply in removal proceedings, and hearsay is admissible unless its use renders the hearing "fundamentally unfair." *Ogbolumani v. Napolitano*, 557 F.3d 729, 734 (7th Cir. 2009); *Pronsivakulchai v. Holder*, 646 F.3d 1019, 1022 (7th Cir. 2011).

> As our colleagues in the Third Circuit have stated in an *en banc* opinion,

> [Al]though the hearsay nature of evidence certainly affects the weight it is accorded, it does not affect its admissibility in immigration removal proceedings. By matter-of-factly dismissing the evidence as 'hearsay,' the IJ failed to explain why it should be accorded no weight. We submit that such seemingly reliable hearsay evidence should not be rejected in such a perfunctory manner.

*Dia v. Ashcroft*, 353 F.3d 228, 254 (3d Cir. 2003) (en banc). The immigration judge and Board were not required to find the hearsay evidence sufficient, but neither could they ignore the evidence simply because it was hearsay without considering whether it had any indicia of reliability. *See Gu v. Gonzales*, 454 F.3d 1014, 1021 (9th Cir. 2006) (hearsay may not be rejected out of hand); *see also Sosnovskaia v. Gonzales*, 421 F.3d 589, 594 (7th Cir. 2005) (a fair hearing requires due consideration to the

arguments). In fact, the visit to the farm squares with the modus operandi of the members of the FARC who previously had paid frequent visits to the farms of the uncle and father to make certain the weight of the threat was continuously felt.

The evidence also jibes with the assessment of expert Dr. John Green, who opined that N.L.A. would be in "mortal danger" if forced to return to Colombia because the FARC would eventually find her. (App. 11). Dr. Green explained that:

> Thanks to their nation-wide network of fronts and spies, the FARC would have no trouble finding [N.L.A.] and relocating in Colombia is, therefore, unlikely to offer much protection. Given the Colombian government's poor record of protecting even high profile FARC targets, average citizens know how futile it is to seek official protection. If she were to return, they would eventually find her. Though the FARC does not practice the same kind of brutal and indiscriminate massacres as the paramilitary militias, they do regularly assassinate or kidnap people they have designated as military targets. The FARC tends to see the world in very black and white terms; if one is not with them, one is against them, and therefore a military target.

(R. 133-134).

Of course persecution alone is not enough. The persecution must be "on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); *Cece*, 733 F.3d at 668. In this case, the petitioner claims she has been persecuted based on her member-

ship in a social group and political opinion.[6] Several iterations of the social group have been bandied about in this case. The different iterations of the social group do not upset the claim, as the various characteristics of each have been considered by the immigration judge and Board below. *See Cece*, 733 F.3d at 670. Petitioners originally proposed a social group of children of upper-middle class landowners in Colombia. The immigration judge considered that category as well as one consisting of children or daughters of land owners who have been kidnapped by the FARC. (R. 104). The Board considered both of these groups and concluded that neither was a cognizable social group under the Act. (R. 5). N.L.A.'s current claim on appeal is that she belongs to the social group of "landowners of means who had refused to cooperate with the FARC." (Petitioners' Brief at 18).

This en banc court has recently explored the boundaries of cognizable social groups under the Act. *Cece*, 733 F.3d at 668-677. A social group is one in which membership is defined by a characteristic that is either immutable or is so fundamental to individual identity or conscience that a person ought not be

---

[6]  N.L.A. asserts that she was denied due process because the Board considered social group without briefing from the petitioners. The petitioners, however, did in fact brief the issue (R. 41-42). Furthermore, the matter had not been conclusively decided in N.L.A.'s favor by the immigration judge as the petitioners claim. The immigration judge stated only that the petitioner "could well" establish her position in a social group (and then equivocated by saying that it seemed "overly broad"), (R. 75), but then based his decision on a finding of lack of persecution instead. In any event, the issue was briefed and in play and N.L.A. was not denied due process.

required to change it. *Id.* at 669; *Matter of Acosta*, 19 I. & N. Dec. 211, 233-34 (BIA 1985). Our cases have made clear that sometimes an asylum applicant acquires membership in a group with a qualifying immutable characteristic because a shared past experience or status cannot be undone. For this reason, the educated, landowning class of cattle farmers targeted by the FARC constitutes a social group. *Tapiero de Orejuela v. Gonzales*, 423 F.3d 666, 672 (7th Cir. 2005). *See also Escobar v. Holder*, 657 F.3d 537, 545–46 (7th Cir. 2011) (former truckers—or, more generally, those with a special skill needed by the persecutors—constitute a social group because their past actions and acquisition of skills are unchangeable); *Sepulveda v. Gonzales*, 464 F.3d 770, 771–72 (7th Cir. 2006) (subordinates of the attorney general of Colombia who had information about insurgents plaguing that nation); *Gatimi*, 578 F.3d at 614 (former members of a violent and criminal faction in Kenya); *Benitez Ramos v. Holder*, 589 F.3d 426, 428–29 (7th Cir. 2009) (tattooed, former Salvadoran gang members who had since turned to God); *Lwin v. INS*, 144 F.3d 505, 512 (7th Cir. 1998) (parents of Burmese student dissidents).

In addition to this Circuit's decision in *Tapiero de Orejuela*, other courts have found that land ownership may be the basis for a social group. *See Cordoba v. Holder*, 726 F.3d 1106, 1114 (9th Cir. 2013) ("Both our court and other circuits have followed the BIA's lead in recognizing that landownership may be the basis of a particular social group."). In fact, the seminal case in which the Board defined "social group" directly addressed the issue of land ownership stating: "The shared characteristic might be an innate one such as sex, color, or kinship ties, or in some circumstances it might be a shared past

experience such as former military leadership or *land owner-ship*." *Matter of Acosta*, 19 I. & N. Dec. at 233 (emphasis supplied).

The Board considered two social groups first, "a child or daughter of a land owner who has been kidnapped by the FARC," and second, "landowners of means who refuse to support the FARC." In both cases the Board rejected the categories as being too broad, too amorphous and unspecific. The Board criticized the first category as being "too broad, as it could apply to any child of a kidnapped landowner, regardless of the child's age, location, or life circumstances, particularly regardless of whether the child holds or will inherit title to the family property, which is the feature that the respondent contends makes her a target of the FARC." (R. 5). The Board distinguished the second category from the social group of wealthy and educated land owning cattle farmers targeted by FARC in *Tapiero de Orejuela* by stating that the group in the latter case was narrower and more particular because it was defined not simply as "wealthy landowners, but as wealthy and educated cattle farmers." (R. 6). The Board's distinction, however, is one without a difference. To begin, the Board has rejected the idea of wealth as a social group, distinguishing it from landowning by its relative nature. As another circuit explained:

> For purposes of determining a social group, land-ownership may appear to be indistinguishable from wealth in many aspects. The BIA has held, however, that the latter attribute does not, standing alone, generally form the basis of a particular social group.

> *See* A–M–E, 24 I. & N. Dec. at 73–76. Its reason for so
> holding was that it found wealth to be too "indeter-
> minate," in that it might "vary from as little as 1
> percent to as much as 20 percent of the population,"
> and that it would be too difficult to determine who
> the members of the purported class would be. *Id.* at
> 76. The BIA noted, nevertheless, that "in appropriate
> circumstances, "wealth" may be a shared character-
> istic of a social group," when the group is more
> "defined" (such as when a government or an uncon-
> trolled rebel group targets individuals above an
> established income level). *Id.* at 75 n. 6. The BIA has
> recognized that, in contrast, "land ownership" is an
> "easily recognizable trait[ ]," see C–A–, 23 I & N.
> Dec. at 959–60, and, even in its decisions distinguish-
> ing wealth, has recognized landownership as a
> "common, immutable characteristic," see A–M–E–,
> 24 I. & N. Dec. at 73.

*Cordoba,* 726 F.3d at 1116. In short, wealth drops out of the
comparison and the only distinction left in *Tapiero de Orejuela*
is the "highly educated" one—a trait that likely is of little
interest to the FARC whose main concern is the need to fund
its war chest and the uneven accumulations of land and
wealth.

More importantly, however, is the fact that this court does
not determine the legitimacy of social groups by the narrow-
ness of the category. In *Cece* we specifically rejected "broad-
ness" as a per se bar to protected status. *Cece,* 733 F.3d at 674.
In *Cece* we catalogued a long list of very broad categories that

have passed muster as social groups. *Id.* at 674-75 (citing cases involving women in tribes that practice genital mutilation, persons who oppose forced sterilization in China, Somalian subclans, homosexuals in Cuba, and Filipinos of Chinese ancestry living in the Phillipines). We also noted that it would be antithetical to asylum law to deny refuge to a group of persecuted individuals who have valid claims merely because too many have valid claims. *Id.* at 675. This would be akin to saying that the victims of widespread governmental ethnic cleansing cannot receive asylum simply because there are too many of them. *Id. citing Singh v. I.N.S.*, 94 F.3d at 1353 ("Thus, we reject the notion that an applicant is ineligible for asylum merely because all members of a persecuted group might be eligible for asylum."). We have stated in no uncertain terms that denying legitimate asylum applications merely because the group of applicants might be too great is unreasoned and impermissible: "the United States has every right to control immigration. But Congress has not authorized the immigration service to do so by denying asylum applications in unreasoned decisions." *Iao v. Gonzales*, 400 F.3d 530, 533 (7th Cir. 2005).

In any event, broad categories need not open the floodgates of immigration. Demonstrating that one belongs to a social group is only the first step in determining asylum and says nothing about whether the applicant will be able to establish the nexus between that membership and the persecution required to warrant asylum. *Cece*, 733 F.3d at 674. As the Board itself explained "the fact that almost all Somalis can claim clan membership and that interclan conflict is prevalent should not create undue concern that virtually all Somalis would qualify for refugee status, as an applicant must establish he is being

persecuted on account of that membership." *In re H-*, 21 I. & N. Dec. 337, 343 (BIA 1996).

The Board also rejected N.L.A.'s proposed social groups because "[t]he characteristic of being a 'landowner of means' is not immutable, as one can change one's status by selling, losing or abandoning one's property, as the respondent did here." (R. 6). Having cited *Tapiero de Orejuela* earlier, this was an odd assertion for the Board to make, as we addressed that issue directly in *Tapiero de Orejuela* and readily dismissed it by noting that "even if the family were to give up its land, its cattle farming, and even its educational opportunities, there is no reason to believe that they would escape persecution." *Tapiero de Orejuela*, 423 F.3d at 672-73. The court went on to note that a family could be targeted for persecution based on past membership in the cattle farmer, landowning class—a category which is undoubtedly immutable. *Id.*

Although the issue was not raised by the Board, it warrants mentioning that the fact that N.L.A. and her family belong to a category of persons targeted by the FARC does not disqualify their otherwise valid social group consisting of Colombian land-owning farmers. As we emphasized in *Cece*, "[a] social group cannot be defined merely by the fact of persecution or solely by the shared characteristic of facing dangers in retaliation for actions they took against alleged persecutors. That shared trait, however, does not disqualify an otherwise valid social group." *Cece*, 733 F.3d at 671 (internal citations omitted).

We need not decide whether the social group of "child[ren] or daughters of a land owner who has been kidnapped by the FARC" is a cognizable social group as N.L.A. has demon-

strated membership in one legitimate social group—Colombian land owners who refuse to cooperate with the FARC. Likewise, just as in *Tapiero de Orejuela*, it is possible that N.L.A. and her family were also members of a smaller social group consisting of the close family members of the father and uncle, but we need not decide that now.

In sum, there can be no rational reason for the Board to reject a category of "land owners" when the Board in *Acosta* specifically used land owning as an example of a social group and this Circuit has made clear that the category of educated land owning cattle farmers targeted by the FARC qualifies as a social group.

For this reason we also do not need to determine whether the FARC targeted N.L.A. based on her family's anti-FARC political opinion. The petitioner contended that her father refused to support the FARC based on his political opinion, but N.L.A. would have had to show that "politics rather than many other likely reasons lay behind [her] unwillingness to support FARC." *Tapiero de Orejuela*, 423 F.3d at 674. In this case, we are told that N.L.A.'s father refused to pay the *vacuna* based on his objection to the FARC cause, but we are not told about N.L.A.'s own political opinion on the matter.

For the final hurdle, N.L.A. must demonstrate that the government of Colombia acquiesced in the persecution. Persecution does not include the actions of private citizens unless the government is complicit in those acts or is unable or unwilling to take steps to prevent them. *Cece*, 733 F.3d at 675 (*citing Bitsin v. Holder*, 719 F.3d 619, 628 (7th Cir. 2013)).

The Board concluded that N.L.A. had not demonstrated that the FARC is a group that the government cannot or will not control. The Board reasoned that the FARC had been considerably weakened by the government's ramped up military and police operations, by the assassination of the FARC's leaders, and desertions caused by the weakened leadership.

The fact that the Colombian government is, of late, engaged in more concerted and successful efforts to control the FARC, however, does not necessarily mean that it cannot also remain willfully blind to the torturous acts of the FARC.

> Where a government contains officials that would be complicit in torture, and that government, on the whole, is admittedly incapable of actually preventing that torture, the fact that some officials take action to prevent the torture would seem neither inconsistent with a finding of government acquiescence nor necessarily responsive to the question of whether torture would be inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

*De La Rosa v. Holder*, 598 F.3d 103, 110 (2d Cir. 2010).

On the other side of the scale, the Board considered the testimony of Dr. Green about the ongoing strength of the FARC in Colombia. Dr. Green testified that despite Colombia's efforts to extinguish the FARC, the FARC "has demonstrated an amazing ability to survive and assert itself" and that "the FARC is very far from defeated." (R. 1031). Neither the

immigration judge nor the government questioned Dr. Green's credentials. As a researcher, Dr. Green studied and compiled the opinions of other experts in supporting his opinion. The Board discounted Dr. Green's testimony as being based on various levels of hearsay. As we discussed above, hearsay is admissible in removal proceedings as long as it is probative and not fundamentally unfair. *See Ogbolumani*, 557 F.3d at 734. And in any event, Federal Rule of Evidence 703 allows experts to rely on hearsay if it is the kind of facts or data upon which "experts in the field would reasonably rely." Fed. R. Evid. 703; *U.S. v. Fenzl*, 670 F.3d 778, 782 (7th Cir. 2012). Someone like Dr. Green, who studies the FARC as the Colombia Country Specialist for Amnesty International and as Senior Research Fellow of the Council on Hemispheric Affairs, could certainly assess the reliability of other researchers' reports and rely on them in the ordinary course of his work. Moreover, Dr. Green's opinion is supported by the U.S. Department of State Country Reports both at the time he testified in 2008 and the most current Country Report which indicates that the FARC continue to commit a not insignificant number of unlawful killings and kidnappings (R. 907); U.S. Department of State, *Colombia 2012 Human Rights Report*, available at the permalink at http://www.state.gov/j/drl/rls/hrrpt/humanrightsreport/ index. htm?year=2012&dlid=204438.[7]

---

[7] According to the 2012 report:

Guerrilla groups were also responsible for unlawful killings of government security forces and civilians. On January 21, FARC guerrillas employed a bomb concealed on a live horse to attack a passing patrol, killing one soldier and wounding two others. On

(continued...)

This type of evidence is precisely what convinced this court in 2011 that "[g]iven the strength of FARC in Colombia, its state-like status, its ongoing war with the Colombian govern-

---

[7] (...continued)

February 3, FARC guerrillas detonated a motorcycle bomb in front of a police station in the city of Tumaco, Narino Department, killing 11 police officers and wounded more than 70 police and civilians. On March 9, a FARC ambush in the department of Arauca resulted in the deaths of 11 army soldiers patrolling the area. On April 7, on the road between Quibdo, Choco Department, and Medellin, Antioquia Department, FARC guerrillas placed a false emergency call summoning army assistance; when the soldiers arrived, the FARC ambushed the unit, killing seven and wounding two others.

In many areas of the country, the FARC and ELN worked together to attack government forces or demobilized paramilitary members; in other areas they fought each other. Various courts convicted members of the FARC secretariat in absentia on charges including aggravated homicide.

The FARC killed persons it suspected of collaborating with government authorities or rival drug-trafficking groups. The CNP reported that through September the FARC had killed at least 163 civilians. For example, on January 28, FARC forces in the department of Antioquia killed two civilians and then ambushed CNP forces that attempted to respond and investigate the crime.

All guerrilla groups killed some kidnapping victims.

* * *

The government reported that guerrillas kidnapped 33 persons (17 by the FARC and 16 by the ELN) during the year.

See http://www.state.gov/j/drl/rls/hrrpt/humanrightsreport/index.htm#wrapper

ment, and the impotence of the government over FARC, the 'state action' element of *Escobar's* claim is easily met by the evidence showing that FARC has persecuted him." *Escobar*, 657 F.3d at 543 (internal citations omitted).

The Country Reports (even if relied on with a grain of salt, *see Koval v. Gonzales*, 418 F.3d 798, 807-08 (7th Cir. 2005)) do not support the notion that there has been a significant reduction in killings and kidnapping since the decision in *Escobar*. *Compare* U.S. Department of State, *Colombia 2008 Human Rights Report*, available at http://www.state.gov/j/drl/rls/hrrpt/ 2010/ wha/154499.htm (129 killings and 64 kidnappings by the FARC) *with* U.S. Department of State, *Colombia 2012 Human Rights Report*, available at http://www.state.gov/j/drl/rls/ hrrpt/humanrightsreport/index.htm?year=2012&dlid=204438 (163 killings and 33 kidnappings by the FARC).

The Board also ignored the testimony of the family that they could not rely on the police to protect them. N.L.A.'s husband, H.O.P.M., testified that "it is common knowledge in Colombia that the FARC has informants in all parts of the government, even the police department. I even heard that they have computers in which they can type someone's number and get that person's entire record." (R. 392) (aff. of H.O.P.M. at p. 5). N.L.A. testified that when her father was kidnapped the family opted not to seek police help, as the police would be ineffective and could not protect them from the repercussions of contacting the authorities: "we never called the police because the FARC 'doesn't forgive' and we feared even stronger repercussions if they found out we sought help. They are everywhere in Colombia and we feared they

would find out if we spoke to the authorities, and that the police could do little to protect us." (R. 384) (aff. of N.L.A. at 7). Fear of repercussions, and the inability of the police to protect the family from them, fueled many decisions not to call police for help. *See* (R. 381-82) (aff. of N.L.A. at 4-5); (R. 391-92) (aff. of H.O.P.M. at 4-5); (R. 404) (aff. of N.L.A.'s daughter at 2.) (R. 380) (aff. of N.L.A. at p. 3). N.L.A. testified:

> My aunt called the police, and the police investi-gated after she told them that it was the FARC who killed her husband. The police, however, did not do much else because they also fear the FARC. The best they did for my aunt was to tell her that it was "under investigation."… The police have questioned my uncle's neighbors, but they give very little information, if any, under the "law of silence," a fear which the FARC has instilled in everyone.

*Id*.

The Board states that it considered the record as a whole in evaluating government acquiescence, but then cites in great detail reports that the power of the FARC has been reduced, but fails to mention even one piece of the testimony from the family about their experiences with the FARC or any of the evidence from Country Reports that the FARC kidnapping and murder rates have changed very little. And as the Second Circuit noted, it is not inconsistent for some parts of a govern-ment to be involved in efforts to reduce private persecution, while others continue to turn a blind eye, or worse yet, aid in that persecution. *De La Rosa*, 598 F.3d at 110; *see also Pieschacon-Villegas v. Attorney General of U.S.*, 671 F.3d 303, 312

(3d Cir. 2011) ("The mere fact that the Colombian government is engaged in a protracted civil war with the FARC does not necessarily mean that it cannot remain willfully blind to the torturous acts of the FARC.")

Finally, the Board concluded that N.L.A. could safely relocate in Colombia just as her sister had. The Board stated, "Although the respondent's sister and her family apparently move and change their phone numbers often, and have registered their pharmacy under a third party's name, the sister and her family routinely leave their home to work and attend school." (R. 8). This is quite an extensive "although." One need not be secreted in an attic behind a hidden bookcase to be living in hiding. As we explained above, moving frequently, changing phone numbers and living under an assumed identity is a horrible way to live and certainly constitutes living in hiding. It is an error of law to assume that an applicant cannot be entitled to asylum if she has demonstrated the ability to escape persecution only by chance or by trying to remain undetected. *Giday v. Gonzales*, 434 F.3d 543, 555 (7th Cir. 2006). N.L.A.'s sister has not demonstrated that she has safely relocated. The Board's conclusion that N.L.A. could indeed relocate, which is based on what the Board views as her sister's success, is not reasoned or logical.

For these reasons, we GRANT the petition for review and REMAND this matter to the Board for further proceedings consistent with this opinion.