In the

# United States Court of Appeals

## For the Seventh Circuit

No. 22-3124

IRMA ELIZABETH MUNOZ-RIVERA, *et al.*,

*Petitioners,*

*v.*

MERRICK B. GARLAND, Attorney General
of the United States,

*Respondent.*

Petition for Review of An Order
of the Board of Immigration Appeals.
Nos. A209-299-363, A209-299-364,
A209-299-365.

ARGUED MAY 25, 2023 — DECIDED AUGUST 24, 2023

Before EASTERBROOK, ROVNER, and LEE, *Circuit Judges*.

ROVNER, *Circuit Judge*. Irma Munoz-Rivera and her
daughters, Ana Cristina and Maria, fled Guatemala where
they allege they were victims of domestic abuse, and sought
asylum in the United States, entering without inspection in

August 2016.[1] The immigration judge found that Munoz's
claims were not supported by credible evidence and denied
her petition. The Board of Immigration Appeals affirmed and
ordered removal to their countries of citizenship, which is
Honduras for Munoz and Guatemala for Ana and Maria.
Because the decisions were supported by substantial
evidence, this court must deny Munoz's petition for review.

**I.**

Munoz was born in and is a citizen of Honduras. She
moved to Guatemala at age twenty-five to join some family
members, but never acquired lawful status there. In
Guatemala, she entered into a twelve-year relationship with
Esduardo Mazariegos, with whom she had two daughters,
Ana and Maria, who by birth became citizens of Guatemala.
When Munoz was pregnant with Maria, Esduardo began a
relationship with another woman, Alejandra Oneida
Escalante, and his relationship with Munoz deteriorated.[2]

Munoz and her children left Guatemala for the United
States in August 2016. She applied for asylum under 8 U.S.C.
§ 1158(b)(1)(A) along with withholding of removal under
8 U.S.C. § 1231(b)(3)(A), and relief under the Convention
Against Torture. The daughters sought derivative beneficiary
status under 8 U.S.C. § 1158(b)(3), and as such their claim for

---

[1] Irma Munoz-Rivera refers to herself as Ms. Munoz in her brief, and
so we will do the same.

[2] The immigration judge and Board referred to Esduardo Mazariegos
(also referred to as Esduardo Gomez) as "Esduardo," and Alejandra
Oneida Escalante Sabillon (also referred to as Oneida Alejandra) as
"Oneida," and so, for simplicity, we will do the same.

relief is entirely based on the success of Munoz's claim. *See N.L.A. v. Holder*, 744 F.3d 425, 432–33 (7th Cir. 2014).

At her credible fear interview held shortly after her arrival in the United States, Munoz stated that she was afraid of Oneida who had insulted and threatened her and wanted her to leave Guatemala. In response to a direct question about physical harm, Munoz stated that she had not been physically harmed by Oneida or anyone else. She also stated that the police would protect her in Guatemala. In an updated asylum application, however, she claimed that she was the victim of domestic violence at the hands of Esduardo. The declaration submitted with her application added that Oneida had threatened to kill her, and also described an incident in which her husband chased her with an axe. In her legal brief in support of the application she added that Esduardo repeatedly hit her and her daughters.

At her trial before the immigration judge, Munoz testified that Esduardo was physically and mentally abusive, and that the abuse began primarily when and because Esduardo began a relationship with Oneida. In testimony, she described Esduardo's taunts and verbal abuse, as well as the axe-chasing event whereupon she fell and received five stitches on her head. She also testified that she tried to leave the house, but Esduardo found her and threatened to take her daughters if she tried to leave again. She asserted that she could not go to the police because they would not help a foreigner, but that Esduardo's mother would often intervene when Esduardo was abusive. Munoz left for the United States because she feared that Esduardo's mother, who had become ill with cancer, would no longer be able to protect her. According to Munoz's testimony, Esduardo and Oneida wanted her to

leave Guatemala, but she feared they would continue to harass her if she went to Honduras, as Oneida had family there and would "find a way to continue bothering" her. Administrative Record (A.R.) at 154. Munoz's cousin in Honduras told Munoz that Oneida and Esduardo reached out to her and said that they will not leave Munoz alone and will look for her wherever she is.

On cross examination, when the Department of Homeland Security attorney asked Munoz why she had told the asylum officer that that she had not been harmed by anyone other than Oneida, Munoz replied "[b]ecause she was the only one who had harmed me, and he who hurt me a lot." A.R. at 152. The Department attorney asked Munoz if Oneida ever hit her, and she responded "No, she only threatened me." A.R. at 156. And when asked if Esduardo ever hit her, she responded, "[h]e will come to threaten me, and my mother-in-law would defend me." *Id*. When the Department attorney asked why she testified on direct examination that Esduardo hurt her a lot, she answered that it "was true because he mistreated me a lot" and would "say mean things" all the time. A.R. at 157–58. The Department lawyer also asked her why Oneida would still pursue her in Honduras if Oneida's goal was for Munoz to leave Guatemala. Munoz simply responded that Oneida "would find a way to continue bothering me." A.R. at 154.

On re-direct examination, Munoz's attorney asked, "did your ex-partner ever hit you?" Munoz replied, "No, he just mistreated me verbally with his threats." A.R. at 159. When asked why she testified earlier that he did physically hit her, she replied, "no just when he was chasing" her and she fell and hurt her head. *Id.* She added that he would chase her around with a knife every week for ten years and once "threw

the door" on her and hurt her finger. A.R. at 159–61. She also testified on re-direct that she was uncomfortable sharing this information with the male asylum officer at her credible fear interview.

Munoz also testified about an incident in 2010 when she alleged that Oneida kidnapped Ana. Munoz explained that she sent Ana to the store, and an hour later a cousin called to say that Ana was with Oneida in Huehuetenango, which was about two hours away.[3] The immigration judge asked how she could have received a call from her cousin about the kidnapping one hour after it happened if Ana was taken two hours away, and Munoz responded, "Well, because he was over there and Huehuetenango." A.R. at 169–70. When asked why Oneida would take her daughter, Munoz stated that it was because Oneida wanted Esduardo "to come to her [Oneida's] house." A.R. at 170. But Munoz also confirmed that Esduardo was living with Oneida at the time of the kidnapping. According to her testimony, she went to the police department, but the police told her not to press charges, and Oneida also begged her not to press charges. She stated that she nevertheless filed a police report that same day, but when questioned as to why the police report was dated 2016, she explained that she did not receive a copy until 2016.

The immigration judge held that Munoz's testimony was not credible based on the cumulative effect of the inconsistent, vague, and evasive testimony, and thus she did not meet her burden under the REAL ID Act. Pub. L. No. 109-13, 119 Stat.

---

[3] Munoz stated that Ana was five years old at the time of the events, but the government's brief notes that if the kidnapping happened in 2010, Ana would have been seven or eight.

302 (2005); 8 U.S.C.A. § (b)(1)(B)(iii). Moreover, the immigration judge found that the documentary evidence did not rehabilitate her claim, and therefore denied her application for asylum, withholding of removal, and protection under the Convention Against Torture. The immigration judge also denied Munoz's request to have Ana testify as the judge explained that she did not think her testimony would be relevant and she did not "see any benefits of having a child or minor testify about an event that she probably did not understand when she was 5 years old." A.R. at 171. The Board affirmed, finding that the immigration judge based her credibility finding on specific and cogent reasons, agreeing that the testimony was inconsistent, implausible, and vague. The Board found that Munoz "also did not challenge the Immigration judge's findings she made as to the respondent's implausible and vague testimony … [and] did not address the inconsistency regarding when she filed the police report," and thus waived any challenge to those findings made by the immigration judge. A.R. at 4. Because the Board agreed with the decision of the immigration judge, we review the immigration judge's decision as supplemented by the Board. *Cui v. Garland*, 71 F.4th 592, 599 (7th Cir. 2023).

## II.

Munoz bears the burden of proving that she is a refugee who is unwilling or unable to return to her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42), 1158(b)(1)(B)(i). Victims of domestic violence may meet this burden if they "would experience extraordinary abuse if they were sent back to their home country." *Sarhan v. Holder*, 658

F.3d 649, 662 (7th Cir. 2011). But when the abuse is at the hands of a private person, rather than the government, the acts cannot be called "persecution" unless the government is unwilling or helpless to protect against the abuse. *Gatimi v. Holder*, 578 F.3d 611, 616–17 (7th Cir. 2009). Munoz makes a fleeting claim that she belongs to a social group of "Honduran women being treated as property." Munoz Brief at 4. Social group claims, however, are a specific type of asylum claim and require particular proffers about the cognizability of the group. *See, e.g., Cece v. Holder*, 733 F.3d 662, 668–70 (7th Cir. 2013). Although Munoz uses the words "social group," she does not set forth any arguments to support such a claim. In any event, we need not belabor whether she meets the definition of a social group because, as we address below, the immigration judge and Board decisions rejecting her claims are supported by more than sufficient evidence, and Munoz has waived challenges to many of those findings.

## A. Waiver

A court may review a final order of removal only if the applicant first exhausts "'all administrative remedies available to the alien as of right,' 8 U.S.C. § 1252(d)(1), and … this includes the obligation first to present to the Board any arguments that lie within its power to address." *Issaq v. Holder*, 617 F.3d 962, 968 (7th Cir. 2010) (*quoting Ghaffar v. Mukasey*, 551 F.3d 651, 655 (7th Cir. 2008)).[4] To exhaust a claim, the

---

[4] Recently, the Supreme Court held that § 1252(d)(1)'s exhaustion requirement is not jurisdictional and does not require asylum seekers to request discretionary forms of review, like reconsideration of an unfavorable Board determination. *Santos-Zacaria v. Garland*, 143 S. Ct. 1103, 1116-20 (2023). It does still, however, require exhaustion of remedies "available …

(continued)

petitioner must argue it specifically and with enough detail to put the Board on notice that the petitioner is trying to challenge the immigration judge's decision based on that argument. *Kithongo v. Garland*, 33 F.4th 451, 458 (7th Cir. 2022). "It is not enough that the new argument bears some relation to the evidentiary record." *Nyandwi v. Garland*, 15 F.4th 836, 841 (7th Cir. 2021).

The immigration judge made numerous findings regarding Munoz's credibility and her corroborative evidence. But in Munoz's appeal to the Board, the only argument she made regarding the credibility determination was that the credible fear interview should be deemed to be unreliable. She did not directly challenge the judge's credibility findings regarding her vague and inconsistent testimony. For example, among other things, she did nothing to address the inconsistencies between her asylum application and her testimony regarding her husband's alleged abuse, and she did not address the problems with the contradictory portions of the description of the kidnapping or the problematic police report dates. Because Munoz's arguments failed to engage substantively with most of the immigration judge's factual findings regarding credibility, the Board held that she "waived any challenge" to those findings. A.R. at 4. *See Kithongo*, 33 F.4th at 457–58. We agree.

The Board also noted that Munoz did not address the immigration judge's findings on the corroborating evidence. The sole argument Munoz made regarding the corroborating evidence was that the judge failed to consider it. But as the Board

as of right" like the initial immigration hearing and appeal to the Board. *Id.* at 1116.

noted, the immigration judge did indeed consider the corroborating evidence, but found that it too lacked credibility or reliability. The Board properly noted that an immigration judge is permitted to make reasonable inferences among the plausible possibilities and explanations in the record and that the reasons cited by the immigration judge were an adequate basis for her adverse credibility finding under the totality of the circumstances.

Munoz compounds the problem by also failing to challenge the immigration judge's credibility findings in her brief before this court. She merely argues that the immigration judge was "simply incorrect" that Ms. Munoz was not credible, and that she rehabilitated her testimony by explaining the inconsistencies. Munoz Brief at 5. She also argues that her "misstatements did not go to the heart of her claim." *Id.* As for the corroborating evidence, Munoz argues once again that the immigration judge failed to consider the police report and the testimony of her expert witness. None of these arguments substantively challenge the immigration judge's credibility findings, and thus those challenges are waived.

## B. Credibility

But even were we to give Munoz the benefit of the doubt that her conclusive statement that the immigration judge erred was enough of a challenge to the credibility finding, her argument is not that the immigration judge applied the incorrect criteria, or otherwise legally erred. Instead, Munoz argues that given the evidence, the immigration judge should have found her to be credible. But an assessment of credibility is a factual finding to which we must give the immigration judge's finding great deference. *Cui*, 71 F.4th at 600.

As a preliminary matter, Munoz's claim that her inconsistencies did not go to the heart of her claim is both legally irrelevant and factually inaccurate. Under the REAL ID Act, an immigration judge may base an adverse credibility finding on any inconsistencies or falsehoods in the applicant's testimony, without regard to whether they go to the heart of the applicant's claim. *Cojocari v. Sessions*, 863 F.3d 616, 620 (7th Cir. 2017) (*citing* 8 U.S.C. § 1158(b)(1)(B)(iii)). And although the immigration judge must "distinguish between inconsistencies … that are material and those that are not," in this case, inconsistencies around whether Munoz's husband physically harmed her or not, and whether evidence supported her claim that her daughter was kidnapped, are the very essence of her claim. *See Cui*, 71 F.4th at 599.

Asylum cases often turn on the immigration judge's credibility determinations and when they do, an "adverse credibility determination will doom an applicant's claimed eligibility." *Dai v. Garland*, 24 F. 4th 628, 635 (7th Cir. 2022). We give great deference to an immigration judge's factual findings and uphold them so long as they are supported by substantial evidence. *Cui*, 71 F.4th at 600. This is particularly true for credibility findings, which we overturn only in "extraordinary circumstances." *Id.* (*quoting Santashbekov v. Lynch*, 834 F.3d 836, 839 (7th Cir. 2016)). The only question for an appellate court reviewing the agency's factual determinations "is whether *any* reasonable adjudicator could have found as the agency did." *Garland v. Ming Dai*, 141 S. Ct. 1669, 1678 (2021) (emphasis in original). In other words, we will reverse only if the record evidence compels a contrary conclusion. *Lozano-Zuniga v. Lynch*, 832 F.3d 822, 826 (7th Cir. 2016).

The immigration judge properly described the legal framework for assessing credibility noting that "the respondent's testimony alone is sufficient to satisfy her burden of proof *only if* the court determines that the testimony is credible, persuasive, and refers to specific facts sufficient to demonstrate that the respondent is a refugee." A.R. at 52 (*citing* INA § 208(b)(1)(B)(ii)). And the immigration judge properly noted that she could base her adverse credibility findings on inconsistencies in the evidence and assess Munoz's credibility "using whatever combination of considerations seems best in the situation at hand." *Id.*

The immigration judge then thoroughly assessed Munoz's credibility, by considering her "demeanor, candor, responsiveness, the inherent plausibility of her claim, the consistency between oral and written statements, and the internal consistency of her statement" and found that she was not credible. A.R. at 52. The immigration judge noted that she considered the totality of the circumstances and relied on the cumulative effect of the inconsistencies in her assessment.

Munoz argues that the evidence compels a contrary conclusion, but this is impossible to reconcile with the evidence before the immigration judge. The immigration judge (and then the Board) set forth in great detail the inconsistencies that it found most troubling. The immigration judge based her assessment on Munoz's "dramatically differing accounts" regarding domestic abuse, including whether she was physically harmed at all and if so, by whom, and the implausibility of her narrative about Oneida and her ability and desire to continue harming her in Honduras. A.R. at 52–53. The immigration judge found the testimony about the kidnapping to be vague, evasive, and riddled with inconsistencies including

about exactly what happened and the dates of the alleged po-
lice report of the incident. The immigration judge set forth
these findings in much greater detail than we need to describe
in our deferential review. *See id.*

Munoz argues that "on re-direct examination, [she] pro-
vided a reasonable explanation for any prior inconsistencies
because she was hesitant to openly discuss her being a victim
of domestic violence to male border officials." Munoz Brief at
5. But the immigration judge considered her testimony on re-
direct "that she was not comfortable discussing the relation-
ship at the interview with a male asylum officer," A.R. at 51,
but nevertheless found that Munoz was not credible. This is
the exact type of evidence weighing to which we must give
the agency great deference. *Feto v. Gonzales*, 433 F.3d 907, 911–
12 (7th Cir. 2006). We cannot say that no reasonable adjudica-
tor could have found as the agency did. *Ming Dai*, 141 S. Ct.
at 1678.

Munoz also claims again in this appeal that the immigra-
tion judge failed to consider any corroborating evidence that
rehabilitated her credibility, including the police report de-
scribing the daughter's kidnapping and the expert testimony.
The immigration judge did, in fact, consider this corroborat-
ing evidence. The immigration judge considered the police re-
port but found it unreliable due to the discrepancy about the
dates. The immigration judge also considered the testimony
of the expert but concluded that it had little probative value
because his statement was based on his conversation with Ms.
Munoz and her declaration, which the court had already
found to be unreliable. The court also considered the fact that
Munoz did not submit corroborating evidence from her
cousin who told her that Oneida and Esduardo were still

looking for her. Finally, the judge acknowledged that the country-condition reports corroborated problems with domestic violence, and she was cognizant of the fact that victims of domestic abuse often have trouble testifying about it, but nevertheless she was unconvinced of Munoz's credibility. The immigration judge did not fail to consider the corroborating evidence, Munoz simply does not agree with the agency's conclusions about it. Once again, we are not a rubber stamp for immigration judges' findings, but our review is indeed deferential. *Feto*, 433 F.3d at 911.

### C. Ana's Testimony

In a single sentence of her brief before the Board, Munoz stated that the judge "Failed to allow Ms. Munoz's oldest daughter to testify [at] their hearing, which in itself could be deemed a violation of due process under the 5th [A]mendment." A.R. at 24. She did not allege how she was prejudiced by any possible violation. Nor did she do so in her brief in this appeal. This argument is therefore waived. *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) ("[E]ven arguments that have been raised may still be waived on appeal if they are underdeveloped, conclusory, or unsupported by law.")

### D. Withholding of Removal and CAT

Because Munoz has not met the lower burden for asylum, she cannot meet the higher burdens required for withholding of removal under 8 U.S.C. § 1231(b) and protection under the Convention Against Torture. *Alvarenga-Flores v. Sessions*, 901 F.3d 922, 926 (7th Cir. 2018).

### III.

Munoz offers no basis for us to conclude that the record compelled a different result than that reached by the agency. Consequently, the petition for review is DENIED.