In the

# United States Court of Appeals

### For the Seventh Circuit

No. 20-1966

OSCAR GUZMAN-GARCIA,

*Petitioner,*

*v.*

MERRICK B. GARLAND,
Attorney General of the United States,

*Respondent.*

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A205-287-030.

ARGUED FEBRUARY 12, 2021 — DECIDED MAY 3, 2021

Before RIPPLE, HAMILTON, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Oscar Guzman-Garcia fled Mexico for the United States in 2006, fearing gang retaliation for witnessing the murder of his older brother. Unfortunately, he did not apply for asylum and withholding of removal until 2014—eight years after his unauthorized entry. As a result, the immigration judge ("IJ") determined that Guzman-Garcia's asylum application was untimely. The IJ found that he had not

filed it within the one-year statutory deadline that begins upon entry to the United States or shown that he qualified for an exception. Alternatively, the IJ concluded that even if the application was timely, she would nonetheless exercise her discretion to deny it, given Guzman-Garcia's criminal history and lack of rehabilitation evidence. The Board of Immigration Appeals (the "Board") affirmed the decision on the untimely basis. On petition for review, Guzman-Garcia challenges only the IJ's alternative basis for denial of his petition—the exercise of discretion to deny asylum. Because Guzman-Garcia has raised no arguments against the dispositive determination that his application is time-barred, we deny his petition for review of the Board's decision to deny asylum.

Guzman-Garcia separately contests the Board's denial of his petition for withholding of removal. The Board held that Guzman-Garcia had not established any of the requisite elements and affirmed the IJ's decision. Because substantial evidence supports the Board's denial of Guzman-Garcia's petition for withholding of removal, we deny his petition for review.

## I.

### A.

Guzman-Garcia, a Mexican citizen, entered the United States illegally in September 2006 because he feared gang violence in Mexico. In January 1999, Guzman-Garcia witnessed the murder of his older brother, Oton. The brothers were walking in the city of Acapulco, Guerrero, Mexico when men asking for money accosted them. Guzman-Garcia testified that he knew that they were gang members from their speech, clothes, and tattoos. One of the men began beating Oton when

he denied their request and another shouted "kill him, kill him." When Guzman-Garcia ran, the men started shooting at him. He was able to escape but heard the men yelling that they would find and kill him eventually.

Oton passed away shortly after the attack. Guzman-Garcia admitted that he was unsure why the men targeted his brother and that he did not recognize the men or gang that attacked them. Police told Guzman-Garcia's father not to report Oton's murder to avoid retribution. Guzman-Garcia also testified that in the days following Oton's death while he was still in Acapulco, friends told him that "some guys were asking about me and that they were going to look for me until they found me, because we had a problem pending." Roughly one year later, two men dressed similar to those who murdered Oton shot through the walls of Guzman-Garcia's family home in Iliantenco. The men did not identify themselves. Additionally, at some unspecified time, two unknown men went through the neighborhood asking for the Guzman family, but Guzman-Garcia did not know whether they were the people who murdered Oton.

Guzman-Garcia resided in Mexico for approximately five years after his brother's murder. Following the shooting at his family's home, however, he moved fifteen hours away to Puebla, where he lived from November 2001 until August 2003. He later resided in Mexico City between August 2003 and September 2006, when he entered the United States. During this time, he experienced no gang interaction. Further, since Guzman-Garcia relocated to the United States, neither he nor his family have received any threats. Guzman-Garcia testified, however, that he did not feel safe. He claimed that "over and over, people from Iliantenco, Guerrero, that knew me

would give me information that some people wanted to kill me because I was the main witness to my brother's death." Guzman-Garcia testified that he entered the United States to escape from his life of fear.

On October 10, 2013, the Department of Homeland Security charged Guzman-Garcia with removability as an alien present without being admitted and served him a notice to appear. Guzman-Garcia admitted his removability but filed applications for asylum and withholding of removal in 2014.

**B.**

The IJ denied asylum on two independent bases. She held that the application was untimely and that even if it was not, she would exercise her discretion to deny it. The IJ also denied withholding of removal. The crux of her opinion centered on Guzman-Garcia's proposed protected group—witnesses of gang crimes who could potentially testify against the gang—which she held was not cognizable. The IJ determined that this social group was not sufficiently "particular" and "socially distinct." She separately held that Guzman-Garcia did not establish the second element, that he will suffer harm or persecution upon return to Mexico. She found that his family had remained unharmed, that Guzman-Garcia himself had lived in Mexico without incident for six years following the murder, that there was no evidence that anyone had tried to locate him in the years immediately following Oton's murder, and that Guzman-Garcia had not shown that anyone would attempt to target him now for witnessing a murder nearly twenty years ago. Consequently, she held that he was unlikely to experience harm upon returning to Mexico.

The Board affirmed the IJ's decision on both applications. It upheld the IJ's determination that Guzman-Garcia's asylum application was untimely. It also affirmed the IJ's denial of withholding of removal because it determined that Guzman-Garcia had failed to establish the three required elements. Guzman-Garcia now petitions for review of the Board's decision.

## II.

"Where, as here, the BIA's decision adopts and affirms the IJ's conclusion as well as provid[es] its own analysis, we review both decisions." *Bathula v. Holder*, 723 F.3d 889, 897 (7th Cir. 2013) (internal quotation omitted). We review legal questions de novo and findings of fact for substantial evidence. *Meraz-Saucedo v. Rosen*, 986 F.3d 676, 684 (7th Cir. 2021). Under the substantial-evidence standard, we reverse factual findings by the Board and IJ only if "any reasonable adjudicator would be compelled to conclude the contrary." 8 U.S.C. § 1252(b)(4)(B); *Meraz-Saucedo*, 986 F.3d at 684.

## A.

The Immigration and Naturalization Act (the "Act") requires petitioners to file asylum applications within one year of entry, with certain narrow exceptions. 8 U.S.C. §§ 1158(a)(2)(B), 1158(a)(2)(D); 8 C.F.R. § 1208.4(a)(2), (4)–(5). Immigration judges have discretion to grant asylum if a petitioner satisfies all requirements. 8 U.S.C. § 1158(b)(1)(A). Here, Guzman-Garcia argues only that the IJ's determination not to exercise her discretion to grant asylum was error. He does not address the separate and dispositive determination that his application is statutorily time-barred, despite the

government pointing out this deficiency in its brief. That is fatal to his petition. We thus deny Guzman-Garcia's petition for review of the Board's denial of his asylum application.

**B.**

We likewise deny his petition for review of the Board's denial of his application for withholding of removal. A successful application requires the petitioner to show that his "life or freedom would be threatened in that country [of removal] because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). That standard involves three elements: (1) membership in a protected group; (2) risk of harm in the country of removal; and (3) a nexus between the harm and group membership. "An applicant does not have a well-founded fear of persecution if the applicant could avoid persecution by relocating to another part of the applicant's country of nationality … if under all the circumstances it would be reasonable to expect the applicant to do so." 8 C.F.R. § 1208.13(b)(2)(ii).

We "review the Board's findings under the substantial evidence standard," which requires us to assess whether the Board's denial of Guzman-Garcia's application "is supported by reasonable, substantial, and probative evidence on the record considered as a whole. …" *N.L.A. v. Holder*, 744 F.3d 425, 430 (7th Cir. 2014). Under this "extremely deferential" standard, *Molina-Avila v. Sessions*, 907 F.3d 977, 982 (7th Cir. 2018), we will "reverse only if the evidence compels a contrary conclusion." *Abdoulaye v. Holder*, 721 F.3d 485, 490 (7th Cir. 2013) (internal quotation omitted).

Guzman-Garcia argues that the Board erred in holding that the IJ correctly decided that Guzman-Garcia had not established any of the elements necessary for withholding of removal. As to the first element, he contends that we have rejected the legal standard the IJ applied when evaluating whether he demonstrated membership in a protected group. On the risk-of-harm element, he suggests that the IJ overlooked substantial evidence showing that he would be persecuted if he returned to Mexico. Lastly, he argues that the IJ did not make a finding on the nexus element. We need not address Guzman-Garcia's arguments as to the first and third elements because he has failed to establish the second element.

The record does not show that Guzman-Garcia is likely to suffer persecution due to his experience as a witness to an incident of gang violence twenty years ago—much less that there is no substantial evidence to support the IJ's determination to that effect. Crediting Guzman-Garcia's testimony, gang members threatened him at the time of his brother's murder, and while he was in Mexico, acquaintances told him "over and over" that people were looking for him. Several months after the murder, unknown men fired on his family's home. On one occasion, he heard that people were looking for his family, but he did not know if these people were gang affiliated.

Despite his fears and the reported threats, Guzman-Garcia lived in two different cities in Mexico for roughly five years following his brother's murder, all without incident. It is now almost twenty years since he witnessed the crime, and he has been out of the country for nearly fourteen of those years. There is no evidence that his family has been threatened since he left Mexico or that he has heard of people looking for him

since his departure or threatening him. On these facts, the Board's conclusion that he would not suffer future harm upon return to Mexico was supported by substantial evidence.[1]

## Conclusion

Because Guzman-Garcia has not overcome the dispositive holdings informing the Board's denial of his applications for asylum and withholding of removal, we deny the petition for review.

---

[1] Guzman-Garcia faults the IJ for incorrectly stating that he lived in Mexico for six years after Oton's murder (as opposed to five) and for stating that the gang made no attempt to find him. While these statements were incorrect, there is still substantial record evidence to support the IJ and Board's conclusions that he did not demonstrate that he would suffer future harm if removed to Mexico.