In the

# United States Court of Appeals
## For the Seventh Circuit

No. 20-2285

BUKOLA LOMI OMOWOLE,

*Petitioner*,

*v.*

MERRICK B. GARLAND,
Attorney General of the United States,

*Respondent*.

Petition for Review of an Order
of the Board of Immigration Appeals.
No. A055-580-956

ARGUED FEBRUARY 10, 2021 — DECIDED JULY 29, 2021

Before MANION, KANNE, and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge*. Bukola Lomi Omowole seeks review of an order of the Board of Immigration Appeals sustaining the findings of two immigration judges that she is both removable from the United States for having procured an entry visa by fraud and not entitled to asylum or withholding of removal. Because the decision of the Board rests on the

immigration judges' adverse findings as to Omowole's credi-
bility and that of her ex-husband, and those findings are sup-
ported by substantial evidence, we deny the petition for re-
view.

**I.**

Omowole, a native and citizen of Nigeria, married her first
husband, Ayebamileru Festus Omowole ("Festus"), in Janu-
ary 2007. Festus had won a diversity lottery visa for admis-
sion to the United States in 2006, and Omowole, as his spouse,
was eligible for a derivative visa. But by the time the two of
them emigrated (separately) to this country in the second half
of 2007 they were, by their own account, estranged as a result
of Festus's disclosure that he had fathered a child with an-
other woman before he married Omowole. Upon arrival in
the United States, Omowole settled in Indiana and Festus in
California. The two never cohabited in this country as hus-
band and wife. Omowole would later testify that she spoke
with her husband on the phone regularly and that she visited
him in California for a month. Ultimately, however, they were
unable to reconcile, and in 2011, they divorced.

Festus subsequently married the mother of his child.
When he then attempted to become a naturalized citizen of
the U.S., and at the same time sought lawful permanent resi-
dent status for his new wife and his child, the U.S. Citizenship
and Immigration Service ("USCIS") began to investigate
whether his marriage to Omowole had been a sham entered
into for the purpose of facilitating her entry into the United
States. USCIS officer Nai Saelee, of the Fraud Detection and
National Security Unit, interviewed Festus in 2013, challeng-
ing him persistently as to whether the marriage to Omowole
was genuine. Festus ultimately admitted that it was not and

executed an affidavit to that effect.[1] Saelee subsequently prepared a statement of findings summarizing the interview, Festus's admission, and the affidavit. Based on those findings, the USCIS concluded that the marriage was a sham and that Omowole had procured her entry visa by fraud. Festus and Omowole were both placed in removal proceedings.[2]

Judge Vinikoor conducted an evidentiary hearing on Omowole's removal at which Omowole, Festus, Omowole's brother, and officer Salee testified.

Omowole recounted the circumstances of her marriage and her emigration to the United States: She met Festus in her hometown in Ile-Oluji, Nigeria in February of 2006. They exchanged phone numbers and dated telephonically in the ensuing months because he lived two and half hours away in Lagos. After three months, they became engaged, and they were married before a judge in January 2007, eleven months after they first met. Their mothers attended the wedding along with other family members. The couple consummated the marriage, and Omowole relocated to Lagos to live with Festus in his apartment there. She did not learn of Festus's plan to relocate to the United States, or her own eligibility for a visa as his wife, until after the marriage. She also did not

---

[1] After reviewing an unofficial transcript of the interview (submitted by Omowole and admitted into evidence) and hearing testimony concerning what transpired during the interview, the immigration judge observed, "[A]pparently the officer kept on saying he wasn't going to take, he didn't believe [Festus] when he said it wasn't a sham marriage. And he kept pressing, … [Festus]. He kept pressing and pressing. Tell me the truth. Tell me, you know, and then eventually there was an admission. …" A.R. 327.

[2] Although the government has continued to pursue Omowole's removal, we are advised that Festus is no longer in removal proceedings.

know, until about a month after the wedding, that Festus had fathered a child with another woman. By the time they received their visas for entry into the United States, Omowole had surmised that Festus was still in a relationship with the mother of his child. The two quarreled and the marriage faltered. They traveled separately to the United States and lived apart on arrival: Omowole settled in Indianapolis with her brother and Festus shared an apartment with a friend in Sacramento, where members of his family lived. According to Omowole, she visited Festus for a month in California, but they did not get along. She returned to Indiana and did not see him again over the course of the next three years, although she said they spoke by phone regularly. Ultimately, in 2011, they divorced.

Omowole acknowledged that her brother had sent Festus and her some money on two occasions—first when they were planning their wedding, and then again after they received their visas and were relocating to the United States—but she denied having offered Festus any money in exchange for her derivative visa.

Omowole's brother, Kehinde Akindele, testified that he emigrated to the U.S. from Nigeria in 2010, several years after his sister did. (He too won a lottery for a diversity visa.) Akindele was aware of the circumstances of Omowole's marriage to Festus and believed the marriage to be genuine. He had met Festus in September 2006 when Festus was dating his sister, and the two became friends and socialized. Omowole and Festus were married in court, and Akindele was among the family members who attended the wedding. According to Akindele, Omowole and Festus lived together for eight months in Lagos. He confirmed, however, that the couple

never lived together in the United States, explaining that they had had a falling out once Omowole learned about Festus's child. Omowole told him that she did visit Festus in California on one occasion.

Officer Saelee gave testimony concerning the USCIS investigation into the marriage and Festus's admission that the marriage was a sham. The marriage was flagged for inquiry based on the issuance of their entry visas and their emigration to the United States shortly after they were married, coupled with the fact that they never lived together in this country. Adding to the suspicion were the immediate relative petitions that Festus subsequently filed on behalf of his son and the child's mother: Festus had not disclosed the existence of his child during his initial immigrant visa interview in 2007. When Saelee interviewed Festus in February 2013, Festus initially denied that his marriage to Omowole was a sham, but he ultimately confessed that he entered into the marriage for the purpose of facilitating her entry into the United States. He told Saelee that after he won the lottery for a diversity visa, he was approached several times at work by two men who proposed that, in exchange for reimbursement of his visa fees, he marry someone who would then accompany him to the United States. Festus acknowledged that he was compensated for his visa fees. At the conclusion of the interview, he completed a form affidavit attesting to the sham nature of the marriage.[3] Saelee denied having made any promises or threats to Festus.

---

[3] The affidavit comprised a pre-printed form on which Festus answered various questions in his own hand. Festus indicated that (1) he entered into the marriage with Omowole just so that she could obtain a green card;

Finally, Festus, in his testimony, disavowed the signed affidavit he had completed attesting to the fraudulent nature of his marriage to Omowole, averring that he was browbeaten into making the statement by Saelee. Festus testified that he told Saelee half a dozen times that he did not marry Omowole for money, but Saelee promised him that he would arrange citizenship for Festus and permanent resident status for his new wife and child if Festus admitted that his marriage to Omowole had been a sham and threatened Festus with arrest and revocation of his green card if he did not make that admission. "I was pushed to the wall," Festus testified. A.R. 293.

> [W]hatever the truth I told them, they don't want to listen. They don't want to hear that. [Saelee] promised me if I do what he want to hear, he is going to do what I want for me. So I … tell him the, what he want to hear.

A.R. 266–67. Thus, according to Festus, he made up the story about men approaching him with offers of money in exchange for marrying Omowole because that is what Saelee wanted to hear; the officer also told Festus what to say in his written statement.

Festus recalled that after he first met Omowole in 2006 and until their marriage in 2007, the two had spoken by phone frequently and visited one another on the weekends. He

---

(2) they never lived together as husband and wife; (3) they did not consummate the marriage; (4) his visa fees of $1200 were paid for in return for marrying Omowole; (5) two men had approached him on multiple occasions after he won the lottery for a diversity visa to ask him if he would marry Omowole, and on the third occasion, he agreed; and (6) he did not know why he married Omowole. A.R. 486-87.

believed he had already won the diversity lottery and submitted his application for a visa by the time he proposed marriage to Omowole, but he did not tell her about it at that time. Once they were married, they lived together in Nigeria as husband and wife for a period of eight months. Festus denied that Omowole's family had paid him any money or provided financial support to the couple.

Festus said he did not learn until shortly before he left Nigeria for the United States in 2007 that he had previously fathered a child with another woman; he also denied continuing his relationship with the child's mother while he was married to Omowole. When he told Omowole about the child, the marriage deteriorated, and they traveled to the United States separately.

Festus acknowledged that he and Omowole never lived together in the U.S. nor did they visit one another, although they spoke by phone daily. He did buy a plane ticket so that Omowole could visit him in Sacramento, but by his account, the ticket was canceled and she never made the trip. Their divorce became final in 2011. Festus married his second wife after that, although he could not recall the date.

After considering the evidence, Judge Vinikoor found that Omowole's marriage was a sham and that she had procured her derivative diversity visa by fraud, rendering her removable from the U.S. The IJ in the first instance found the testimony of Saelee and his statement of findings as to the sham nature of the marriage to be credible and accorded them "substantial weight." A.R. 517. At the same time, the IJ granted only "limited weight" to the testimony of Omowole and Festus, which he found to be less credible. A.R. 518. In support of this adverse credibility assessment, the judge noted that (1)

there were several conflicts between their testimonies and Festus's prior statements as to whether Omowole had visited Festus in California (and, if so, for how long),[4] whether Omowole or her family had given Festus any money, whether the pair had consummated their marriage, and whether they were married before or after Festus had won a diversity visa; (2) their accounts were vague as to their first meeting, their dating history and engagement, and exactly when Festus won the visa lottery; (3) although Omowole's brother had confirmed that she and Festus had lived together in Lagos after they married, Omowole herself had offered scant detail concerning her cohabitation with Festus in Nigeria nor had she submitted any documentary evidence of their cohabitation; (4) it was unclear, given the inconsistencies in their testimonies, whether Omowole and Festus had made an effort to maintain and patch up their relationship once they were living in the United States[5] and which of them initiated the divorce; and (5) there was no documentary evidence tending to corroborate their testimony that the marriage was genuine.

Particularly in view of Festus's affidavit confessing that the marriage was a sham and Saelee's credible testimony as to the circumstances of that statement, Judge Vinikoor found the evidence on the whole to be clear and convincing that Omowole had entered into the marriage for the purpose of

---

[4] In the interview with Saelee, Festus said that Omowole had visited him in California for six months (A.R. 398), but then in his testimony before Judge Vinikoor, Festus denied that Omowole had visited him at all (A.R. 270); for her part, Omowole testified that she had visited Festus but that the visit lasted only one month (A.R. 145).

[5] Both testified, however, that they had stayed in touch by telephone, which Festus explained as an ongoing effort to resolve their differences.

obtaining immigration benefits. (The judge rejected Festus's assertion that he was coerced into making statements against his interest during the interview with Saelee.) Judge Vinikoor noted that the couple had never lived together in the United States; Festus admitted to Saelee that he had engaged in marriage fraud; there was little to no evidence confirming the dating relationship and marriage ceremony; Festus had maintained a relationship with another woman to whom he was now married; there was insufficient evidence that the couple had in fact lived together in Lagos; and there was insufficient evidence—such as joint tax returns, wedding pictures or other photographs of the couple, or bank statements—to rebut the government's "overwhelming evidence" that the marriage was a sham. A.R. 521. The judge therefore concluded that Department of Homeland Security ("DHS") had adequately established Omowole's removability.

Having been found removable, Omowole then petitioned for asylum, withholding of removal, and relief under the Convention Against Torture. Like Festus, Omowole had remarried in 2011 following their divorce: she had wedded Victor Aknxootu, a prosperous Nigerian farmer from her agrarian hometown. Omowole testified that her family had forced her into the marriage, and that Aknxootu had given her family livestock, food, clothing, and money (to pay her now-deceased mother's medical bills) as a "bride price."[6] They had a traditional wedding in December 2011 attended by some 200 to 300 people (including Omowole's sister, who still lived in Nigeria). Aknxootu had two other wives and four children.

---

[6] Aknxootu had also been lending financial support to the family prior to the marriage. Omowole's mother had suffered a debilitating stroke in 2003 and apparently incurred substantial medical bills.

After the wedding, she stayed with Aknxootu for two months, sharing his three-bedroom home with his other wives and their children. She then left Nigeria for the United States, where she stayed for some eight months before returning to her husband in Nigeria in late 2012. She testified that Aknxootu and his other wives beat her on a daily basis and that Aknxootu demanded that she return the $15,000 to $16,000 he had spent on gifts to her family in exchange for a divorce. In 2013, having spent just two months in Nigeria, she left again for the United States, only to find herself placed in removal proceedings the following year based on the allegation that her marriage to Festus had been a sham.

In seeking relief from removal, Omowole alleged that if she were removed to Nigeria, she would face violence at the hands of her second husband and his other wives, because as a Nigerian woman whose family was paid money by her husband to marry her, she is regarded as his property. In her estimation, the abuse would resume upon her return to Nigeria and might one day result in her death. Omowole testified that divorcing Aknxootu was not an option because of her family's culture. Even if it were, she would have to repay Aknxootu and do so all at once—she and her brothers had explored the possibility of repaying him on an installment plan, but Aknxootu had vetoed that idea. Reporting the violence she had experienced to the police was also not an option (she had tried), because Aknxootu was rich and the police regarded spousal abuse as a private family matter. Finally, there was nowhere else in Nigeria for her to live: her parents were dead, and her sister (the only sibling still living in Nigeria) had her own family and only limited resources.

Following Judge Vinikoor's retirement, Judge Elizabeth Lang conducted a hearing on Omowole's claims for relief but ruled against her. Omowole was the sole witness in the second proceeding, and the judge found that she was not sufficiently credible for her testimony alone to establish her eligibility for relief from removal. The judge noted that parts of Omowole's story were vague and/or inconsistent with the documentary record. She had supplied only limited details concerning her marriage to Aknxootu and the abuse she had suffered. The date she gave for her second marriage was inconsistent with the testimony she had given during the removal hearing in 2013. Moreover, the statement she had given in support of her application for asylum had not mentioned any abuse. Because Omowole was not sufficiently credible and persuasive on her own, the judge invoked her authority under the REAL ID Act to require Omowole to present evidence corroborating the circumstances of her second marriage. *See* 8 U.S.C. § 1158 (b)(1)(B)(iii). Omowole provided no such evidence: She produced no marriage certificate (which Omowole attributes to the fact that it was a traditional wedding), and neither did she present statements or letters from any of the 200 to 300 guests she said had attended her wedding to back up her account of her marriage to Aknxootu. Likewise, she had not supplied any statements or letters from family members who would have been aware of the family's financial arrangements with him. Nor did she articulate why it would have been unreasonable for her to pursue and present such corroborative evidence. For these reasons, the judge concluded that Omowole had not presented a credible case in support of relief from removal. The court went on to conclude, alternatively, that the circumstances as described by

Omowole did not warrant a grant of asylum, withholding of removal, or relief under the Convention Against Torture.

Omowole appealed the adverse findings of both immigration judges to the Board of Immigration Appeals (the "Board" or "BIA"), which dismissed her appeal in a decision issued in June 2020. The Board agreed that the DHS had met its burden to prove by clear and convincing evidence that Omowole had procured her entry visa by fraud or misrepresentation (her sham marriage to Festus), rendering her inadmissible at the time of her entry into the United States and thus removable. *See* 8 U.S.C. § 1227(a)(1)(A). The Board was not persuaded that Judge Vinikoor had placed too much weight on Festus's statements to the fraud detection officer (Saelee) or on the officer's testimony, which formed the heart of the government's case for removability. Nor did the Board find any clear error in the judge's credibility assessments. In the Board's view, the judge had given appropriate weight to the testimonial and documentary evidence in concluding that the DHS had met its burden of proof. The Board therefore affirmed Judge Vinikoor's finding as to removability. As to Omowole's requests for relief from removal, the Board noted *inter alia* that Judge Lang's adverse credibility finding was supported by inconsistencies and omissions in the evidence. There was also a lack of corroborating evidence to support Omowole's allegations as to her second marriage, and the judge had explained why it was reasonable to expect that Omowole ought to be able to produce corroboration. Omowole had thus failed to establish her eligibility for relief from removal. Because the judge's adverse credibility assessment alone was sufficient to support the denial of relief, the Board did not reach the judge's alternative grounds for denying asylum or withholding of removal.

**II.**

In her petition for review, Omowole challenges both the determination that she is removable from the United States for having procured her entry visa by fraud and the decision denying her asylum or withholding of removal.[7] Both determinations rest in the first instance on the immigration judges' adverse credibility findings. The Board, of course, sustained those findings in its decision. So it is that Omowole's appeal focuses primarily on the propriety of the immigration judges' credibility determinations. As the Board adopted and elaborated on the judges' findings, we review the decisions of the immigration judges as supplemented by the Board. *E.g., Guzman-Garcia v. Garland*, 996 F.3d 480, 483 (7th Cir. 2021) (quoting *Bathula v. Holder*, 723 F.3d 889, 897 (7th Cir. 2013)). We will sustain an immigration judge's credibility determination so long as it is supported by substantial evidence. *E.g., Cojocari v. Sessions*, 863 F.3d 616, 621 (7th Cir. 2017) (quoting *Krishnapillai v. Holder*, 563 F.3d 606, 609, 615 (7th Cir. 2009)). The judge must give specific and cogent reasons for her decision to credit one witness over another. *Id.* In finding a witness incredible, she must also take care to distinguish between material lies on the one hand and innocent mistakes and plausible gaps in memory on the other. *Id.* (citing *Kadia v. Gonzales*, 501 F.3d 817, 821 (7th Cir. 2007)).

A.  Removability based on sham marriage

As noted, the government's theory of removability is that Omowole obtained her derivative diversity visa by fraud by entering into a sham marriage with Festus. In assessing the

---

[7] Omowole does not challenge the adverse decision as to her application for relief under the Convention Against Torture.

legitimacy of the marriage for immigration purposes, the central question is whether the couple intended to establish a life together at the time they were married. *Surganova v. Holder*, 612 F.3d 901, 904 (7th Cir. 2010); *Matter of Soriano*, 19 I. & N. Dec. 764, 765 (B.I.A. 1988). The IJ and the Board found that DHS had established that Omowole and Festus did not have this intent at the time of their marriage—*i.e.*, that the marriage was not a bona fide union—by clear and convincing evidence. The issue for this court is whether that determination has the support of reasonable, substantial, and probative evidence on the record taken as a whole. *E.g.*, *Guzman-Garcia*, 996 F.3d at 484. As we have noted, Judge Vinikoor's findings against Omowole on this point turn largely on credibility assessments. In particular, the judge chose to credit and give substantial weight to Festus's affidavit confessing the sham nature of his marriage to Omowole and the USCIS fraud detection officer's testimony about Festus's confession, and to give only limited weight to Omowole's testimony along with her ex-husband Festus's testimony recanting the substance of his affidavit.

It goes without saying that this court's review of the immigration judge's credibility determinations is highly deferential. *E.g.*, *Alvarenga-Flores v. Sessions*, 901 F.3d 922, 925 (7th Cir. 2018) (citing *Song Wang v. Keisler*, 505 F.3d 615, 620–21 (7th Cir. 2007)). Only in extraordinary circumstances will we disturb the judge's assessment. *Krishnapillai*, 563 F.3d at 617; *Song Wang*, 505 F.3d at 620–21.

We see no basis to disturb Judge Vinikoor's credibility assessments here. In terms of crediting the fraud detection officer and Festus's affidavit admitting fraud, Judge Vinikoor considered and rejected the notion that officer Saelee had

coerced Festus into admitting that his marriage to Omowole was a fraud. And although Omowole faults the Board for not addressing this point, we view the Board's decision to affirm the judge's credibility assessments as implicitly, and necessarily, sustaining Judge Vinikoor's finding that Festus's statements against interest as to the marriage were not coerced.

Of course, Festus recanted his affidavit at the removal hearing, but recantations generally are viewed with healthy skepticism, *Arnold v. Dittman*, 901 F.3d 830, 839 (7th Cir. 2018); *United States v. Ogle*, 425 F.3d 471, 478 (7th Cir. 2005), and the judge appropriately cited various inconsistencies between the testimonies of Festus and Omowole and the other record evidence as grounds for discrediting their account at the hearing. *See Alvarenga-Flores*, 901 F.3d at 925–26 (noting that in cases governed by the REAL ID Act, the judge may base her credibility finding on any inconsistency, whether it goes to the heart of the immigrant's claim or not); *Krishnapillai*, 563 F.3d at 616–17 (same); 8 U.S.C. § 1229a(c)(4)(C). These inconsistencies included whether they had consummated their marriage,[8] whether Omowole's family had paid Festus any money (and if so, how much), and whether Omowole and Festus had visited one another after they arrived in the U.S. These were reasonable grounds on which to deem Omowole and her ex-husband incredible. One would expect the couple to be able to recall and make consistent statements as to such matters, which had a substantial bearing on whether their marriage was or was not a sham. The IJ was not simply

---

[8] Omowole's counsel has suggested that Festus was confused about the meaning of consummation. However, the record reflects that both officer Saelee and Judge Vinikoor specifically asked Festus whether he had engaged in sexual relations with Omowole. A.R. 192, 269, 423, 450, 490.

nitpicking about minor discrepancies as to dates, as Omowole suggests. *See Krishnapillai*, 563 F.3d at 617 (noting that the immigration judge must distinguish between material and immaterial consistencies) (citing *Kadia*, 501 F.3d at 822). There was also a lack of any documentary evidence (such as financial records) confirming that they had actually lived together in Nigeria before emigrating. Despite the passage of time, it was not unreasonable for the immigration judge and the Board to think that some evidence of this kind might be available to Omowole. *See* § 1229a(c)(4)(B).

## B. Application for asylum and other relief

Judge Lang rejected Omowole's request for relief from removal, which was premised on Omowole's allegation that, as a Nigerian woman whose family was paid a "bride price" by her second husband, she is regarded as her husband's property and will face continued persecution and abuse from her husband and his family should she be removed to Nigeria, as she lacks the resources to repay her husband for the gifts he made to her family. Omowole's case for relief was premised exclusively on her own testimony, and, again, Judge Lang determined that Omowole was not sufficiently credible as a witness to support her application. The judge noted that Omowole's testimony was vague and lacking in certain details; she had also given inconsistent testimony as to when she married her second husband (2011 versus 2013). There was also another important discrepancy, in that Omowole had not mentioned in her asylum application that her second husband was abusive. That omission is significant, given the central role that the alleged abuse plays in her request for asylum and

withholding of removal.[9] At the same time, the judge was authorized under the Immigration and Nationality Act, as amended by the REAL ID Act, to demand evidence to corroborate Omowole's claims, and Omowole provided none. *See Krishnapillai*, 563 F.3d at 618 (noting broad discretion IJ enjoys under statute to require corroboration regardless of whether immigrant is deemed credible); 8 U.S.C. § 1158(b)(1)(B)(ii). Omowole contends that the demand for corroboration is unreasonable, because there was no marriage certificate, for example, to document her second marriage. *See* § 1185(b)(1)(B)(ii) (only if corroborating evidence is beyond reasonable ability of immigrant to produce is factfinder precluded from insisting on such evidence). But as the government points out, if, as Omowole testified, some 200-300 people (including one of her sisters) attended her wedding to Aknxootu, it is reasonable to think that she ought to have been able to obtain at least one statement from someone in attendance to confirm the marriage. Likewise, one of her brothers was present at the asylum hearing, so one would think he might have been in a position to testify at that hearing and speak to such matters as the circumstances of her second marriage (to the extent he was aware of them as a family member), the significance of a "bride price," and the treatment of Nigerian women in Omowole's position. Finally, we see no

---

[9] We note also that at the conclusion of the removal hearing before Judge Vinikoor, Omowole indicated that she would be seeking to sponsor Aknxootu for admission into the United States. A.R. 228. Certainly it is not unusual or inexplicable for the victims of spousal abuse to make statements that are at odds with the abuse they have suffered. But absent an explanation, this statement is at least arguably inconsistent with the testimony Omowole gave at the asylum hearing as to the abusive nature of the marriage.

evidence that Judge Lang gave controlling weight to Judge Vinikoor's adverse credibility determination, which Judge Lang did not mention in her decision. The very fact that she articulated a specific rationale for discrediting Omowole belies that notion.

In short, Judge Lang reasonably determined that Omowole was not sufficiently credible and had no corroboration to establish the factual underpinning of her claims for asylum and other relief. It is unnecessary for us to reach Judge Lang's alternative reasons for denying Omowole's requests for asylum or withholding of removal, as the adverse credibility determination and the lack of corroboration doom her claims. Neither Judge Lang nor the Board committed any discernable error.

## III.

The adverse credibility findings of the immigration judges, as sustained by the Board, are central to the determinations that Omowole is removable and that she is not entitled to asylum or withholding of removal, and those findings are supported by substantial evidence. We therefore DENY Omolowe's petition for review.