In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 23-1508

ELIZABETH MEJIA-HERNANDEZ, *et al.*,

*Petitioners*,

*v.*

PAMELA J. BONDI, Attorney General of the United States,

*Respondent.*

---

Petition for Review of an Order of the Board of Immigration Appeals.
Nos. A215-765-555, A215-765-556, A215-765-557

---

ARGUED APRIL 10, 2025 — DECIDED JULY 17, 2025

---

Before RIPPLE, HAMILTON, and PRYOR, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Petitioner Elizabeth Mejia-Hernandez, a native and citizen of Honduras, arrived with her children in the United States in June 2018. She and her children were served with notices to appear and placed in immigration removal proceedings in October 2018. Ms. Mejia conceded removability and sought asylum, withholding of removal, or

protection under the Convention Against Torture ("CAT").[1] She claimed that she feared persecution in Honduras from a man who she alleged had killed six members of her family. The immigration judge ("IJ") found her ineligible for asylum, denied her requests for withholding of removal and protection under the CAT, and ordered her removed to Honduras. Ms. Mejia appealed to the Board of Immigration Appeals ("Board"), which agreed with the IJ and dismissed the appeal. Ms. Mejia now petitions for review of the agency's decision.[2] For the reasons stated in this opinion, we grant the petition for review and remand the case to the Board for further consideration of whether the Honduran government was sufficiently involved in Cesar's persecution of Ms. Mejia.

## I

## BACKGROUND

### A.

In or around 1995, Ms. Mejia's uncle, Catalino Hernandez, killed Domingo Ramirez. Seeking "vengeance"[3] for his father's death, Domingo's son, Cesar Ramirez Mejia, traveled four hours from San Isidro to Gracias in pursuit of Ms. Mejia's grandfather, Arturo Hernandez Nunez. Cesar killed Arturo at a bus terminal in Gracias on April 1, 2006. A relative of Ms. Mejia who witnessed the murder heard Cesar yell, "I am going to finish off all these sons of bitches, all these dogs. I'm going to kill all of them these pieces of garbage. None of them

---

[1] Ms. Mejia's children, Angie and Jose Garcia-Mejia, brought derivative claims for asylum pursuant to 8 U.S.C. § 1158(b)(3)(A).

[2] Our jurisdiction is secure under 8 U.S.C. § 1252(a).

[3] A.R. 157.

is going to remain."[4] According to Ms. Mejia, Cesar sent her family anonymous messages threatening to "disappear" or kill them if they reported the murder.[5] Despite these threats, the family reported Cesar, and he was imprisoned for four years.

Shortly after her grandfather's death in 2006, Ms. Mejia and her parents left her hometown of San Isidro and relocated to San Marcos, a town three hours away. While there, they received an anonymous note that read, "I already found you dogs," and featured "crosses and skulls."[6] After five months in San Marcos, the family relocated again, moving four hours away from San Isidro to Macuelizo.

Following Cesar's release from prison in 2010, he threatened to kill Ms. Mejia's mother and her family "for reporting him to the authorities."[7] The violence began anew in 2011, when Arturo's nephew was killed in San Isidro. Between 2014 and 2017, four of Ms. Mejia's cousins were killed—two in San Isidro, and one in San Marcos. And in 2015, another of Ms. Mejia's cousins was shot in San Isidro; he sustained serious injuries but survived the encounter. The family believed that Cesar and his family were responsible for the violence "[b]ecause they said they were going to kill [them] all. They were going to finish off [the] family."[8] Ms. Mejia's sister testified that a witness to one of the murders heard Cesar and his

---

[4] *Id.* at 166.

[5] *Id.* at 482.

[6] *Id.* at 167.

[7] *Id.* at 453.

[8] *Id.* at 173.

brother "talk amongst each other saying 'oh, we're almost done with these sons of bitches. We have very few left.'"[9] Though the police were aware of these murders and apparently investigated them, Ms. Mejia's family did not report their suspicions as to who the perpetrator might be to the police, and no arrests were made. Ms. Mejia testified that they "were afraid" because "the police officers are friends with the Ramirez family."[10] She also indicated that Cesar had friends in local government who "helped him get out of prison."[11]

In early 2018, a bus driver in Macuelizo informed Ms. Mejia that an armed man in Gracias, suspected to be Cesar's brother, was asking about her whereabouts. Ms. Mejia thought the armed man was inquiring about her family "because he wanted to kill" them.[12] Ms. Mejia left Honduras with her children two months later, entering the United States on June 19, 2018.

**B.**

Immigration and Customs Enforcement served Ms. Mejia with a Notice to Appear ("NTA") for removal proceedings in October 2018. The NTA indicated that Ms. Mejia should appear before an immigration judge at a date and time "[t]o be set."[13] Ms. Mejia conceded removability and sought asylum,

---

[9] *Id.* at 211.

[10] *Id.* at 176.

[11] *Id.*

[12] *Id.* at 188.

[13] *Id.* at 525.

withholding of removal, and protection under the CAT.[14] She stated her fear that, if she were returned to Honduras, she would face persecution from Cesar.[15] The IJ found Ms. Mejia and her sister, who also testified at Ms. Mejia's hearing, generally credible but denied all relief.

At her hearing on December 5, 2019, Ms. Mejia moved to terminate and quash the NTA, submitting that the lack of information regarding the proceeding's time and place rendered the NTA inadequate. The IJ denied Ms. Mejia's motion. In a written decision, the judge noted that the statutory date-and-time requirement is not a condition on jurisdiction but is instead a claim-processing rule subject to waiver. The IJ concluded that by failing to object for months and conceding removability at an earlier hearing, Ms. Mejia had waived any objections to the NTA. And, even if her objection were timely, she failed to demonstrate prejudice.

On the merits of her claim for asylum, Ms. Mejia first relied on past persecution. She submitted that her nuclear family was a cognizable social group[16] and that her membership in that group had caused her to be an object of Cesar's threats. The IJ assumed that a petitioner's nuclear family could be a cognizable particular social group and acknowledged that

---

[14] On appeal, Ms. Mejia has expressly waived her claim for relief under the CAT. *See* Petitioner's Br. 12.

[15] Before the IJ and the Board, she also alleged domestic abuse by her former partner that she asserted rose to the level of persecution. She has declined to pursue this claim on appeal. *See id.* at 11.

[16] Ms. Mejia initially presented six possible particular social groups to which she belonged, but on appeal she pursues only her argument regarding her nuclear family.

harm to a petitioner's family members can, in limited circumstances, constitute harm to the petitioner. The IJ nonetheless found that Ms. Mejia "did not experience any direct harm" because there was insufficient evidence that Cesar had killed her family members to target her.[17] The IJ further held that Ms. Mejia had failed to establish the requisite nexus between the harm she alleged and her membership in her nuclear family. Instead, the IJ attributed Cesar's murders to his desire for "revenge based on a personal dispute."[18]

Ms. Mejia also contended that even if she had not been the object of past persecution, she was entitled to asylum because she had a well-founded fear of future persecution. The IJ found insufficient evidence to support this claim. Because the petitioner had lived in Honduras "unharmed" for eleven years, and because her parents remained safely in Honduras, the IJ concluded that Ms. Mejia's fear was not objectively reasonable.[19] Moreover, Ms. Mejia failed to establish that internal relocation was unreasonable. In the IJ's view, apart from the anonymous note, Ms. Mejia had not suffered any harm after leaving San Isidro.

The IJ further found that Ms. Mejia was ineligible for withholding of removal or relief pursuant to the CAT. Having denied all forms of relief, the IJ ordered Ms. Mejia removed to Honduras.

---

[17] A.R. 121.

[18] *Id.* at 123.

[19] *Id.*

## C.

Ms. Mejia appealed the IJ's decision to the Board. She first challenged the denial of her motion to quash and terminate the NTA. Ms. Mejia claimed that she had timely objected to its defects by challenging the NTA before a hearing on the merits of her case. The Board upheld the IJ's determination that Ms. Mejia did not timely object to the NTA, and, even if she had, the Board agreed that she had waived her objection by conceding removability and that the defects did not prejudice her.

Ms. Mejia also submitted that she was entitled to asylum. She renewed her contention that she had suffered persecution because Cesar had "vow[ed] revenge on her family" and killed six of her relatives.[20] She maintained that her nuclear family was a cognizable social group for which she had established the requisite nexus to her alleged persecution. Moreover, she submitted that she had a well-founded fear of persecution "because she believes that Cesar will carry out his threats to eliminate her and the rest of her family."[21] In addition, she challenged briefly the IJ's denial of withholding of removal and relief under the CAT.

The Board agreed with the IJ that Ms. Mejia was not entitled to asylum. It distinguished *N.L.A. v. Holder*, 744 F.3d 425 (7th Cir. 2014), where "harm to the applicant's relatives … w[as] 'meant as a direct threat to N.L.A. herself.'"[22] In the Board's view, there was insufficient evidence that Cesar had

---

[20] *Id.* at 35.

[21] *Id.* at 41.

[22] *Id.* at 6 (quoting *N.L.A. v. Holder*, 744 F.3d 425, 432 (7th Cir. 2014)).

harmed Ms. Mejia's relatives to target Ms. Mejia herself. The Board also affirmed that Ms. Mejia had failed to "establish the requisite nexus between membership" in her proffered social groups and the alleged persecution she endured.[23] In its view, Cesar's murders were the result of a personal dispute and could be attributed to his desire for revenge.

The Board also was not persuaded by Ms. Mejia's argument that she had a well-founded fear of future persecution. The Board found no evidence that Cesar was still looking for Ms. Mejia and noted that her parents remained safely in Honduras. Because Ms. Mejia was not eligible for asylum, the Board further found that she did not qualify for withholding of removal. Finally, because Ms. Mejia did not contest the IJ's holding that she failed to establish a likelihood of future torture, as is required for CAT relief, the Board deemed that issue waived.

The Board dismissed the appeal, and Ms. Mejia timely petitioned for review in this court.

## II

## DISCUSSION

In her petition for review, Ms. Mejia presents two challenges to the agency's determinations. First, she asserts that the deficiencies in her NTA deprived the agency of jurisdiction. Second, she submits that she is entitled to asylum and withholding of removal.

---

[23] *Id.* at 7.

**A.**

We address first whether the Immigration Court had jurisdiction over Ms. Mejia's removal proceedings. 8 U.S.C. § 1229(a)(1)(G)(i) requires that NTAs include "[t]he time and place at which the proceedings will be held." We have held that this statutory requirement is a claim-processing rule, such that defects in an NTA do not deprive the IJ of jurisdiction. *See Ortiz-Santiago v. Barr*, 924 F.3d 956, 963 (7th Cir. 2019).[24] Accordingly, "failure to comply with that rule may be grounds for dismissal of the case. But such a failure may also be waived or forfeited by the opposing party." *Id.* (citation omitted). Though Ms. Mejia's NTA was defective because it did not include the date and time of her removal proceedings, she failed to timely object to the defects. Moreover, she failed to show that her untimeliness was excusable and that the NTA's deficiencies prejudiced her. *See id.* at 965. The IJ and the Board committed no error in proceeding on the basis of the NTA.

---

[24] Our decision in *Ortiz-Santiago v. Barr*, 924 F.3d 956 (7th Cir. 2019), is consistent with those of our sister circuits that have addressed the issue. *See United States v. Bastide-Hernandez*, 39 F.4th 1187, 1188 (9th Cir. 2022) ("Consistent with our own precedent and that of every other circuit to consider this issue, we hold that the failure of an NTA to include time and date information does not deprive the immigration court of subject matter jurisdiction."); *see also, e.g.*, *Martinez-Perez v. Barr*, 947 F.3d 1273, 1278 (10th Cir. 2020) ("[W]e agree with the several circuits that have held that the requirements relating to notices to appear are non-jurisdictional, claim-processing rules."); *United States v. Suquilanda*, 116 F.4th 129, 136 (2d Cir. 2024) ("[T]he Immigration Court did not lack jurisdiction because of a deficiency in the NTA based on the omission of the place-of-hearing information.").

**B.**

We now examine Ms. Mejia's submission that she is eligible for asylum.[25] An asylum applicant must demonstrate that she "is unable or unwilling to return to" her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

Because the Board adopted the IJ's findings and affirmed with additional analysis, we review the IJ's "decision as supplemented by the Board." *Borjas Cruz v. Garland*, 96 F.4th 1000, 1004 (7th Cir. 2024). We conduct a deferential review, considering "questions of law de novo and findings of fact for substantial evidence." *Meraz-Saucedo v. Rosen*, 986 F.3d 676, 684 (7th Cir. 2021) (internal quotations omitted). Whether the petitioner suffered or has a well-founded fear of suffering

---

[25] Ms. Mejia also challenges the Board's denial of withholding of removal. However, because the standard for granting withholding of removal is more stringent than the standard for asylum, we address her asylum claim first. *See Bueso-Avila v. Holder*, 663 F.3d 934, 937 (7th Cir. 2011) ("If an applicant fails to establish eligibility for asylum, he 'necessarily cannot satisfy the more stringent requirement for withholding of removal.'" (quoting *Ahmed v. Ashcroft*, 348 F.3d 611, 615 (7th Cir. 2003))); *W.G.A. v. Sessions*, 900 F.3d 957, 965 (7th Cir. 2018) ("Withholding of removal carries a higher burden on two questions: the *severity* of the harm the applicant faces (persecution versus threat to life or freedom) and the *likelihood* that the applicant will be harmed (well-founded fear versus clear probability).").

persecution are factual findings that "requir[e] reversal only if the evidence compels a different result." *Id.*[26]

### 1.

We turn first to whether Ms. Mejia endured past persecution. For behavior to constitute persecution, it "must rise above mere harassment." *Singh v. Garland*, 89 F.4th 602, 606 (7th Cir. 2024) (quoting *N.Y.C.C. v. Barr*, 930 F.3d 884, 888 (7th Cir. 2019)).[27] Persecution can include "a credible threat to inflict grave physical harm." *Stanojkova v. Holder*, 645 F.3d 943, 948 (7th Cir. 2011).[28] Accordingly, death threats that are "credible, imminent and severe" amount to persecution. *N.L.A.*, 744 F.3d at 431.[29] By contrast, threats that are "too vague and never materialize[] into a more acute and

---

[26] *See also Osorio-Morales v. Garland*, 72 F.4th 738, 741–42 (7th Cir. 2023) (reiterating that we affirm agency decisions "if they are supported by substantial evidence," which "is not a high bar").

[27] *See also Stanojkova v. Holder*, 645 F.3d 943, 948 (7th Cir. 2011) (differentiating between harassment, which "involves targeting members of a specified group for adverse treatment, but without the application of significant physical force," and persecution, which "involves … the use of *significant* physical force against a person's body" or a credible threat thereof).

[28] *See also Bolante v. Mukasey*, 539 F.3d 790, 794 (7th Cir. 2008) ("We have also defined 'persecution' as behavior that threatens 'death, imprisonment, or the infliction of substantial harm or suffering.'" (quoting *Boci v. Gonzales*, 473 F.3d 762, 766 (7th Cir. 2007))).

[29] *See also, e.g., W.G.A.*, 900 F.3d at 962 (concluding that the petitioner had shown past persecution where a gang "threatened his life at gunpoint").

substantial risk" to the petitioner do not constitute persecution. *N.Y.C.C.*, 930 F.3d at 889.[30]

In *N.Y.C.C.*, the petitioner's former partner made a "single vague threat" to take the petitioner's sons away "'the bad way' if necessary." *Id.* at 887, 889. Because the perpetrator "never acted in furtherance of this threat," we determined that it was not sufficiently credible, imminent, or severe to constitute past persecution. *Id.* at 889. Similarly, in *Escobedo Marquez v. Barr*, 965 F.3d 561 (7th Cir. 2020), we determined that five unsettling anonymous threats did not constitute past persecution because the petitioner "was not physically harmed, and no evidence suggest[ed] that the sender attempted to follow through on the threats." *Id.* at 565.

By contrast, in *N.L.A.*, guerillas from the Revolutionary Armed Forces of Colombia ("FARC") kidnapped and killed the petitioner's uncle after he refused to make an extortion payment. 744 F.3d at 429. Two months later, the FARC kidnapped the petitioner's father and threatened to kill the petitioner and her sister if they did not meet the extortionary demand. *Id.* at 429–30. We concluded that the petitioner had suffered past persecution. Even though the threats were "directed primarily" toward the petitioner's family members, not toward the petitioner herself, we determined that "the

---

[30] *Accord Bejko v. Gonzales*, 468 F.3d 482, 486 (7th Cir. 2006) ("Threats can constitute past persecution only in the most extreme circumstances, such as where they are of a most immediate or menacing nature or if the perpetrators attempt to follow through on the threat."); *Pathmakanthan v. Holder*, 612 F.3d 618, 623 (7th Cir. 2010) ("[F]or an unfulfilled threat to rise to the level of persecution, it must be something extraordinarily ominous. It cannot simply be a threat of death that, in context, is just a matter of words.").

murder of N.L.A.'s uncle and the kidnapping of her father were, in fact, part of the threat to N.L.A." *Id.* at 432. We explained that the FARC used violence toward the petitioner's relatives to "announc[e] to N.L.A. and her sister, 'we are targeting your family and this is what happens when you fail to pay.'" *Id.* And the threats were sufficiently credible, imminent, and serious because the FARC "proved that they would follow through on their threats by killing the uncle and kidnapping the father—the gravest harms possible." *Id.*

The Government submits that Ms. Mejia has not suffered past persecution because she "has never been harmed in any way by Cesar."[31] We disagree. For years, Cesar has been threatening Ms. Mejia and her family. When he killed Ms. Mejia's grandfather, Cesar said he was "going to finish off … all these dogs" and was "going to kill all of them."[32] Ms. Mejia's family later received an anonymous threat, and an armed man asked after her whereabouts. Even if the threats are somewhat vague, when considered as a whole,[33] they constitute credible, serious threats to Ms. Mejia and her family. And, importantly, unlike the perpetrators in *N.Y.C.C.* and *Escobedo Marquez*, who did not act in furtherance of their threats, Cesar went beyond mere intimidations, acting on his threats by killing many of Ms. Mejia's family members.

Moreover, Cesar's murders of Ms. Mejia's relatives were part of the threat to Ms. Mejia. *See N.L.A.*, 744 F.3d at 432. Cesar targeted her family for years and, by killing Ms. Mejia's

---

[31] Respondent's Br. 30.

[32] A.R. 166.

[33] *See Bejko*, 468 F.3d at 486 ("[I]t is axiomatic that the evidence of persecution must be considered as a whole, rather than piecemeal.").

family members, reaffirmed repeatedly that he would act upon his threats. Therefore, even though the violence Cesar perpetrated was directed primarily toward Ms. Mejia's relatives, she herself "received a credible threat of imminent harm—one that was backed by the most" serious proof that one could require—the actual killing of multiple family members. *Id.* at 434.

Because Ms. Mejia endured a prolonged pattern of threats and accompanying violence, the record compels the conclusion that she faced past persecution.

**2.**

That a petitioner has suffered past persecution creates a rebuttable presumption that she has a well-founded fear of future persecution. *Cece v. Holder*, 733 F.3d 662, 668 (7th Cir. 2013) (en banc). However, even if the events we have described did not amount to past persecution, Ms. Mejia has established a well-founded fear of future persecution that "is subjectively genuine and objectively reasonable." *Bolante v. Mukasey*, 539 F.3d 790, 794 (7th Cir. 2008). Because "[t]he 'subjective' component rests primarily on the applicant's testimony and the credibility of that testimony," we generally find the subjective element satisfied where, as here, the IJ finds the petitioner's testimony to be credible. *Id.* Regarding objective reasonableness, Ms. Mejia "must prove either that 'there is a reasonable probability that she will be singled out individually for persecution or that there is a pattern or practice of persecution of an identifiable group, to which [she] belongs.'" *Hernandez-Garcia v. Barr*, 930 F.3d 915, 920 (7th Cir. 2019) (alteration in original) (quoting *Ayele v. Holder*, 564 F.3d 862, 868 (7th Cir. 2009)). She must also demonstrate that internal

relocation in her home country would not be reasonable. *See N.L.A.*, 744 F.3d at 431; 8 C.F.R. § 1208.13(b)(2)(ii).

The continuous threats and actual violence toward Ms. Mejia's family establish that her fear of future persecution is reasonable. *See Boykov v. INS*, 109 F.3d 413, 416 (7th Cir. 1997) (explaining that past unfulfilled threats to a petitioner may be "indicative of the danger of future persecution"); *cf. Pathmakanthan v. Holder*, 612 F.3d 618, 624 (7th Cir. 2010) (concluding that one death threat did not create a well-founded fear of future persecution, in part because "the threat was an isolated incident, not part of a series of ongoing threats"). That Cesar has carried out his threats by killing many of Ms. Mejia's relatives renders extraordinarily reasonable her fear that, were she to return to Honduras, she would be in harm's way.

The Government maintains that significant time has passed without incident, such that the evidence does not compel a finding that Ms. Mejia's fear of future persecution is well-founded. For example, in *Guzman-Garcia v. Garland*, 996 F.3d 480 (7th Cir. 2021), the petitioner had, twenty years prior, witnessed a gang murdering his brother. *Id.* at 482. A year after the murder, unknown men shot at the petitioner's family home. *Id.* And, at another time, two unknown men were looking for the petitioner's family. *Id.* We held that the petitioner was not entitled to withholding of removal based on future persecution. *Id.* at 484. We noted that twenty years had passed since the petitioner witnessed the crime. Moreover, he had "lived in two different cities in Mexico for roughly five years following his brother's murder, all without incident." *Id.* And the petitioner's family had not been threatened since he left Mexico. *Id.* By contrast, in *N.L.A.*, we determined that the

petitioner had demonstrated a reasonable fear of future persecution. 744 F.3d at 435. Even though the guerilla group had not contacted the petitioner or her sister in the seven years since their uncle was killed and their father was kidnapped, we found it "unsurprising" given that the petitioner left the country and her sister had gone into hiding, causing the FARC to "los[e] interest." *Id.* Accordingly, the ensuing lack of contact did not undermine the petitioner's well-founded fear of persecution.

Ms. Mejia's fear of future persecution is objectively reasonable. Nearly twenty years have passed since Arturo's murder. *See Guzman-Garcia*, 996 F.3d at 484. But the ensuing years have not passed without incident. Ms. Mejia received a threatening note. Five members of her family were killed, the last sometime in 2017. The following year, an armed man, suspected to be Cesar's brother, inquired as to her whereabouts. She left Honduras within two months, after gathering the necessary funds.[34] Similar to *N.L.A.*, Cesar may have lost interest once Ms. Mejia and her sister left the country, such that their lack of contact with Cesar since coming to the United States is "unsurprising." 744 F.3d at 435. Moreover, Ms. Mejia testified that all her relatives had to flee from San Isidro. Given the pattern of violence against her family members, it is reasonable for Ms. Mejia to fear persecution were she to return to Honduras.

Turning to internal relocation, a petitioner's safe internal relocation must be possible and reasonable. *See Oryakhil v. Mukasey*, 528 F.3d 993, 998 (7th Cir. 2008); 8 C.F.R. § 1208.13(b)(3). The regulations require that we consider the

---

[34] *See* A.R. 191.

totality of circumstances when assessing relocation, "including the size of the country of nationality…, the geographic locus of the alleged persecution, the size, numerosity, and reach of the alleged persecutor, and the applicant's demonstrated ability to relocate to the United States in order to apply for asylum." 8 C.F.R. § 1208.13(b)(3). Whether a petitioner has previously relocated safely can also be relevant to the inquiry. *See Guzman-Garcia*, 996 F.3d at 484; *Caz v. Garland*, 84 F.4th 22, 28 (1st Cir. 2023).

Examining the geographic locus of persecution and Cesar's reach, most of the violence was concentrated in the Honduran town of San Isidro. Four of Ms. Mejia's family members were shot there. However, according to the record, Cesar's reach extends beyond San Isidro. Cesar tracked Arturo to Gracias, a town four hours away, to kill him. He also killed one of Ms. Mejia's cousins in San Marcos, a town three hours away.

Furthermore, Ms. Mejia's previous attempts at relocation proved unsuccessful. After she and her parents relocated to San Marcos, they received the anonymous threat. And when Ms. Mejia lived in Macuelizo, an armed man she believed to be Cesar's brother told an acquaintance, "we already know she lives there,"[35] suggesting that Cesar and his accomplices had found her again. *See Kaiser v. Ashcroft*, 390 F.3d 653, 660 (9th Cir. 2004) (holding that internal relocation was not reasonable for petitioners who received threats in two geographically distant cities in Pakistan). Because Cesar found Ms. Mejia each time she moved, she cannot safely relocate in Honduras.

---

[35] *Id.* at 190.

**3.**

To qualify for asylum based on either past or future per-
secution, the petitioner also must show that there is a nexus
between the persecution and one of five statutorily protected
grounds, in this instance a particular social group. "We have
recognized that membership in a nuclear family can satisfy
the social group requirement." *Meraz-Saucedo*, 986 F.3d at
685.[36] Accordingly, Ms. Mejia must show that there is a nexus
between her persecution and her family membership. *See Bor-
jas Cruz*, 96 F.4th at 1004.

The nexus requirement is satisfied when the petitioner's
familial ties are "at least one central reason" she is subjected
to persecution. *Id.* (quoting 8 U.S.C. § 1158(b)(1)(B)(i)). In
*W.G.A. v. Sessions*, 900 F.3d 957 (7th Cir. 2018), the petitioner's
brother tried to defect from a gang, prompting gang members
to come to the petitioner's home, hold him at gunpoint, and
say, "if you don't [hand] over your brother, you're going to
die here." *Id.* at 961 (alteration in original). We held that the
petitioner's membership in his nuclear family was one central
reason for the persecution he suffered. *Id.* at 966. And in *Gon-
zalez Ruano v. Barr*, 922 F.3d 346 (7th Cir. 2019), a cartel leader
sought to take the petitioner's wife. *Id.* at 349. The cartel began
threatening the petitioner, telling him that he would be killed
unless he left his wife. *Id.* at 349–50. He was later kidnapped
and nearly beheaded. *Id.* at 350–51. We held that there was a
nexus between the petitioner's membership in his wife's

---

[36] *See also Gonzalez Ruano v. Barr*, 922 F.3d 346, 353 (7th Cir. 2019) (collect-
ing cases); *Plaza-Ramirez v. Sessions*, 908 F.3d 282, 285–86 (7th Cir. 2018)
(recognizing that "[a] person's family can qualify as a 'particular social
group'" in a case involving cousins).

family and the persecution he suffered. *Id.* at 355. As we put it, "Gonzalez Ruano's relationship to his wife was the reason he, and not someone else, was targeted." *Id.* at 356.

As in *W.G.A.*, where "the gang repeatedly targeted the entire family because of their relationship to" the defecting brother, 900 F.3d at 966, Cesar and his accomplices repeatedly targeted Ms. Mejia's entire family because of their relationship to Catalino and Arturo. And, as in *Gonzalez Ruano*, Ms. Mejia would not have received threats were she not related to her uncle and grandfather. Her family relationships were the reason she, and not another individual in Honduras, was targeted by Cesar.

The IJ and the Board attributed any persecution Ms. Mejia faced to a private dispute between Cesar and Catalino, not to her membership in a particular social group. It is true that "the requirements for asylum are not satisfied if the harm [the petitioner] suffered was inflicted solely because of a private quarrel." *Gonzalez Ruano*, 922 F.3d at 354. However, Ms. Mejia herself was not involved in the private quarrel between Cesar and Catalino that precipitated the ongoing conflict. It is only her familial ties that make her a target of violence. She has, therefore, established the requisite nexus between her family membership and the persecution she has endured.

**4.**

Finally, "[a]n applicant who claims persecution by a private actor must demonstrate that the government either condoned the persecution or was helpless to prevent it." *Meraz-*

*Saucedo*, 986 F.3d at 686.[37] If "the government has taken some steps (even imperfect ones) toward protecting victims," it may evince an ability and willingness to prevent private persecution. *Osorio-Morales v. Garland*, 72 F.4th 738, 742 (7th Cir. 2023).

Because the IJ's holding rested on what the IJ viewed as other shortcomings in Ms. Mejia's claim for asylum, neither the IJ nor the Board grappled extensively with whether the Honduran government was sufficiently involved in Cesar's persecution, as is required for Ms. Mejia's asylum claim. We therefore decline to determine this matter in the first instance. *See Gonzalez v. Thomas*, 547 U.S. 183, 186–87 (2006) (per curiam) (indicating that the Ninth Circuit should have remanded for the Board to decide an issue it had not considered initially, rather than deciding it "in the first instance").[38] The Board may revisit this issue on remand.

## Conclusion

For the foregoing reasons, we grant the petition for review of Ms. Mejia's asylum case and remand this matter to the Board for further proceedings on the issue of whether the

---

[37] *Accord Chakir v. Gonzales*, 466 F.3d 563, 570 (7th Cir. 2006) ("The acts of private citizens do not constitute persecution unless the government is complicit in those acts or is unable or unwilling to take steps to prevent them.").

[38] *See also INS v. Orlando Ventura*, 537 U.S. 12, 16–17 (2002) (per curiam) (explaining that the Ninth Circuit should have remanded the case for the Board to consider an alternative argument, allowing the agency to "make an initial determination; and, in doing so, … through informed discussion and analysis, help a court later determine whether its decision exceeds the leeway that the law provides").

Honduran government was sufficiently involved in Cesar's persecution of Ms. Mejia.

The parties will bear their own costs on this appeal.

**PETITION GRANTED; REMANDED**